UNITED STATES of America,
Appellee,

v.

Richard ANGLADA,
Defendant-Appellant.

No. 229, Docket 75–1226.

United States Court of Appeals,
Second Circuit.

Argued Sept. 18, 1975.

Decided Oct. 16, 1975.

**8.** In view of this disposition, we do not reach other points raised by Consolidated.

Stephen Gillers, New York City (Elliot A. Taikeff, New York City, on the brief), for defendant-appellant.

Federico E. Virella, Jr., Asst. U. S. Atty. (Paul J. Curran, U. S. Atty., S. D. N. Y., T. Barry Kingham, Asst. U. S. Atty., on the brief), for appellee.

Before MOORE, FEINBERG and OAKES, Circuit Judges.

FEINBERG, Circuit Judge:

The principal issue on this appeal by Richard Anglada from a conviction for violating the narcotics laws is whether the trial judge erred in refusing to submit the issue of entrapment to the jury. We hold that he did, and therefore reverse and remand for a new trial.

I

According to the Government, the evidence in this case showed a typical narcotics transaction. Detective Ralph Nieves testified that on September 3, 1974, he went with a confidential informant, Carlos Santana, to negotiate with one Edward Torres to buy some heroin. Price and place of delivery were agreed upon. When Torres did not appear the next day as planned, Nieves spoke to him on the telephone. Torres told Nieves that he had sent his cousin Richie (appellant Anglada) to meet them because Torres's connection was out of "stuff." On September 6, Nieves and Santana returned to the meeting place. Anglada appeared and was introduced to Nieves by Santana. Anglada assured Nieves that everything was all right, and that Nieves would be buying Torres's stuff, which could "take a five-hit."[1] Anglada left for a short while and then came back with George Shaw, who turned over a package of heroin to Nieves for $1,600; Nieves gave $1,000 to Anglada and $600 to Shaw. Anglada and Shaw left and Anglada turned over to Shaw the money Nieves had given him. Nieves and Santana drove away.[2]

Anglada offered a different version of the transaction. He testified, on his own behalf, that early in September 1974, his fiancee was Maria Matos and Santana was her brother. On the day before the sale, Anglada had a conversation with Santana about getting drugs, which lasted 45 minutes to an hour:

Well, Junior [Santana] was talking to me for quite a while, you know, trying to convince me to do him a favor of getting some drugs for him, and he talked and kept on saying the same things, "Will you do me the favor, will you do me the favor, please. I will come out winning at the end." I told him, "I don't know, Junior." So then he kept on saying, "Please, Richie, I really would appreciate the favor, you know, you are my sister's boyfriend, I want you to help me," and I still told him I wasn't sure. He kept on insinuating with the same thing until he convinced me, and I said, I would let him know.

Anglada also testified that he knew that Santana was an addict and that he had

1. Nieves explained this to mean that the one-ounce package could be "cut" with dilutants to produce five one-ounce packages for street sale.

2. Co-defendant George Shaw, like Anglada, was convicted of conspiring to distribute heroin and of distributing it. 21 U.S.C. §§ 821, 841(a)(1), 841(b)(1)(A), 846. Shaw has not appealed. Co-defendant Edward Torres was acquitted.

given Santana money for clothes and shoes, which Santana had used for drugs. Anglada admitted that he had gone to Shaw and asked him to sell an ounce to his girl friend's brother. The next day, Anglada brought Shaw to the place where Santana was waiting with Nieves and the transaction occurred. Anglada denied that Torres had told him to deliver a message to Nieves and Santana on September 4 or that he had told Nieves that the heroin was Torres's stuff and that it could take a five-hit. Anglada also testified that he had never used or sold heroin and that he only sold the heroin because Santana was his girl friend's brother. Anglada denied keeping any money from the sale.[3]

The district judge refused to submit the issue of entrapment to the jury, holding that:

> [T]he evidence of propensity is uncontradicted. Anglada, for whatever his reasons, readily assisted Santana's efforts to obtain heroin. He did not question the propriety of undertaking such action, and was fully prepared to complete the transaction on the occasion when he met in the car with Junior, Nieves and Shaw.
>
> The evidence shows that Anglada grasped at the opportunity to deal in drugs, albeit in purported assistance of Junior, but nonetheless freely and voluntarily.

From this statement, it appears that the judge correctly understood the law on entrapment in this circuit but misapplied it to the evidence before him.

## II

The leading case in this circuit concerning when the issue of entrapment must be submitted to the jury is *United States v. Riley*, 363 F.2d 955 (2d Cir.

1966), where Judge Friendly fully analyzed the problem. To reach the jury, there must be some evidence of government inducement.[4] Even if government inducement has been shown, however,

> submission to the jury is not required if uncontradicted proof has established that the accused was "ready and willing without persuasion" and to have been "awaiting any propitious opportunity to commit the offense." . . . On the other hand, the production of any evidence negating propensity, whether in cross-examination or otherwise, requires submission to the jury, however unreasonable the judge would consider a verdict in favor of the defendant to be.

363 F.2d at 959.[5] In *Riley*, we stressed the value of jury determination of the issue:

> Cases like this frequently present an issue of credibility as between the agent and the defendant . . .; resolution of such an issue is peculiarly within the jury's province. If it credits the defendant's story in whole or in part, the ensuing question of whether the Government has gone so far in causing the criminal conduct as to take the case outside the definition of the crime and to render punishment an act of injustice, is also highly suitable for determination by a jury representing "the voice of the country."

Id. at 958. In *United States v. Dehar*, 388 F.2d 430, 433 (2d Cir. 1968), we made clear that in deciding whether a jury question is raised, the trial judge must consider the evidence in the light most favorable to the defendant. And in *United States v. Viviano*, 437 F.2d 295 (2d Cir.), cert. denied, 402 U.S. 983, 91 S.Ct. 1659, 29 L.Ed.2d 149 (1971), we discussed what kinds of evidence the

---

3. Shaw, testifying on his own behalf, said that he gave Anglada $100 and a spoon of heroin for his part in the sale.

4. As to which, see the discussion in *United States v. Braver*, 450 F.2d 799, 801–05 (2d Cir. 1971), cert. denied, 405 U.S. 1064, 92 S.Ct. 1493, 31 L.Ed.2d 794 (1972). The Government

admits here that the sale was government-initiated, i. e., "induced." Id. at 805; *United States v. Sherman*, 200 F.2d 880, 883 (2d Cir. 1952).

5. The material in quotes is from Judge Learned Hand's classic formulation in *United States v. Sherman*, supra note 4, at 882–83.

Government may use to show propensity:

> Once the defendant demonstrates inducement, the Government may prove propensity by showing (1) an existing course of criminal conduct similar to the crime for which the defendant is charged, (2) an already formed design on the part of the accused to commit the crime for which he is charged, or (3) a willingness to commit the crime for which he is charged, as evidenced by the accused's ready response to the inducement.

Id. at 299.

■ Turning from these statements of the law to the record before us, there was no evidence of prior drug selling by Anglada or of a previously formed intent to commit the crime. Cf. *United States v. Henry*, 417 F.2d 267 (2d Cir. 1969), cert. denied, 397 U.S. 953, 90 S.Ct. 980, 25 L.Ed.2d 136 (1970) (defendant had previously offered to arrange sales of heroin); *United States v. McMillan*, 368 F.2d 810 (2d Cir. 1966), cert. denied, 386 U.S. 909, 87 S.Ct. 856, 17 L.Ed.2d 783 (1967) (prior narcotics sale by defendant, who did not testify). Instead the Government relies on the third type of evidence of propensity referred to in *Viviano*, supra, "willingness . . . evidenced by the accused's ready response to the inducement." But on this question, Anglada denied any profit on the deal,[6] and testified that his girl friend's brother, the informer, took 45 minutes to an hour

> trying to convince [Anglada] to do him a favor of getting some drugs for him, and he talked and kept on saying the same thing.

We do not know whether a jury would believe any part of Anglada's testimony or, even if it did, whether it would find propensity anyway. But a jury issue was created. In this respect, the case is unlike several recent cases in which we upheld the refusal of the trial judge to submit the entrapment issue to the jury. *United States v. Miley*, 513 F.2d 1191 (2d Cir. 1975) (defendant "fully prepared to complete transaction on the very first occasion"); *United States v. Greenberg*, 444 F.2d 369 (2d Cir.), cert. denied, 404 U.S. 853, 92 S.Ct. 93, 30 L.Ed.2d 93 (1971) (unchallenged evidence that defendant "grasped at the opportunity"); *United States v. Nieves*, 451 F.2d 836 (2d Cir. 1971) ("uncontradicted" evidence that defendants "were willing to supply cocaine in large quantities and of excellent quality"). To the contrary, this case is more like *Riley*, supra, where we reversed for failure to send the issue to the jury: Assuming Anglada's story to be true, as we must for this purpose, the informant had a close connection to the defendant and was known by the defendant to be an addict, and the defendant was not a seller and made no profit on the deal. Cf. also *United States v. Cohen*, 431 F.2d 830 (2d Cir. 1970).[7]

■ The Government argues that Anglada's propensity to sell the narcotics was uncontradicted because immediately after his talk with Santana, Anglada began to look for a source of heroin and never hesitated in going through with the deal. Indeed, this may have been what the trial judge had in mind when he noted that Anglada "was fully prepared to complete this transaction . . . when he met in the car with Junior, Nieves and Shaw." But to the extent that this evidence implied propensity, the argument was for the Government to make to the jury. The defense of entrapment deals with how the crime "originates." *Sorrells v. United States*, 287 U.S. 435, 442, 451, 53 S.Ct. 210, 77 L.Ed. 413 (1932). There is no iron-clad rule that the reluctance that indicates a lack of propensity must continue throughout the transaction. As we said in *Dehar*, supra, 388 F.2d at 434, we can

---

6. This was contradicted by Shaw. See note 3 supra.

7. Cf. also *United States v. Ortiz*, 496 F.2d 705, 707 (2d Cir. 1974) (Oakes, J., dissenting), in which one member of this panel thought there was entrapment as a matter of law in a comparable situation.

well understand the reluctance of a trial judge to charge on entrapment "when he believes the defense is concocted" and the defendant is guilty, but "there is no escape from this when contested factual issues are presented."

## III

In seeking reversal, appellant raises two other points. We deal with them briefly, even though we have already decided that the judgment of conviction must be set aside, because the issues may again be raised in a new trial. The first concerns defendant's inability to obtain testimony from the informer Santana, whom Anglada called as a witness. At a hearing outside the presence of the jury, Santana admitted that he had refused to be interviewed by defense counsel, but had spoken freely to the prosecutor and the police about the events of the case. Nevertheless, on the advice of assigned counsel, Santana asserted his fifth amendment privilege, based upon a pending New York State drug charge against him. Over defendant's objection, the judge sustained the privilege and excused Santana from testifying. Appellant claims that this ruling was erroneous considering the unique nature of Santana's testimony in establishing the entrapment defense (he was the only other participant in the crucial conversation), the protection afforded Santana against a criminal charge in the Anglada transaction because Santana was acting at the Government's request, the lack of connection between the Anglada sale and the state charge, the possible waiver of his fifth amendment rights by his conversations with the prosecutor,[8] and the possibility that his reluctance to testify was based upon fear of Anglada's retaliation rather than on the fifth amendment.

■ The question thus posed is not a simple one. Such cases as *United States v. Domenech,* 476 F.2d 1229, 1231 (2d

Cir.), cert. denied, 414 U.S. 840, 94 S.Ct. 95, 38 L.Ed.2d 77 (1973); *United States v. Llanes,* 398 F.2d 880, 884–85 (2d Cir. 1968), cert. denied, 393 U.S. 1032, 89 S.Ct. 647, 393 L.Ed.2d 576 (1969); and *United States v. Chandler,* 380 F.2d 993, 997 (2d Cir. 1967), are not necessarily controlling. Only in *Llanes* was the reluctant witness asked to shed light on an entrapment issue, and, unlike this case, there was nothing to indicate that the witness had been a police informer who had allegedly "set up" the defendant. As against the lesser showing there of the defendant's need for the evidence, the reluctant witness "was himself under indictment for a narcotics violation which allegedly occurred at the same time and place as appellant's alleged violation," which was "a classical situation for the full exercise of the privilege." 398 F.2d at 884. In this case, there was no apparent connection between the state drug charge used to justify the privilege and the incident on which testimony was sought. It may be that on retrial the issue will be simpler since the state charge may already be disposed of. In any event, we suggest that if the situation arises again, the trial judge take a harder look at any blanket assertion of privilege and also at the possibility of allowing some carefully phrased, limited questions by Anglada's counsel.

■ Finally, appellant objects to the judge's charge on reasonable doubt. The heart of it was appropriate enough, but the somewhat confusing parable of the father and a bundle of twigs and the apparent characterization of the standard as quantitative rather than qualitative both might better have been omitted.

Judgment reversed and case remanded for a new trial.

---

**8.** Appellant cites *United States ex rel. Carthan v. Sheriff, City of New York,* 330 F.2d 100 (2d Cir. 1964). Cf. *Ellis v. United States,* 135 U.S. App.D.C. 35, 416 F.2d 791 (D.C.Cir. 1969), especially at n. 37. See also *United States v. La Sorsa,* 480 F.2d 522, 529–30 (2d Cir. 1973).