UNITED STATES of America

v.

**Anthony J. BROOKS, Appellant.**

**UNITED STATES of America**

v.

**John J. HAZEL, Jr., Appellant (two cases).**

**Nos. 76–1818, 76–1819 and 77–1018.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 1, 1977.

Decided Nov. 10, 1977.

Rehearing Denied Dec. 9, 1977.

---

J. Richard Colbert,* with whom Michael E. Geltner, Washington, D. C., (appointed by this Court) was on the brief for appellant in No. 76–1818.

Aurora C. Jose,* with whom Michael E. Geltner, Washington, D. C. (appointed by this Court) was on the brief for appellant in Nos. 76–1819 and 77–1018.

Mary Ellen Abrecht, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry and James M. Hanny, Asst. U. S. Attys., Washington, D. C., were on the brief for appellee.

Before TAMM, ROBINSON and ROBB, Circuit Judges.

Opinion for the Court filed by ROBB, Circuit Judge.

* Entered appearances as Student Counsel pursuant to Rule 20 of the General Rules of this Court.

Opinion filed by SPOTTSWOOD W. ROBINSON, III, Circuit Judge, dissenting in part.

ROBB, Circuit Judge:

After a trial by jury the appellants Brooks and Hazel were convicted of possession of an unregistered sawed-off shotgun in violation of 26 U.S.C. § 5861(d). They appeal.

At trial the evidence for the government was that between September 1975 and March 1976 the Metropolitan Police and the Federal Bureau of Investigation collaborated in an undercover operation known publicly as P.F.F., Inc., and privately as Police-FBI Fencing Incognito. At a warehouse in northeast Washington officers pretending to be underworld characters purchased stolen goods and contraband with government funds. All transactions between the undercover agents and their customers were recorded by hidden cameras and microphones.

On February 5, 1976 Brooks and Hazel came to the warehouse in an automobile driven by Hazel. Stopping at a nearby telephone Hazel called P.F.F., Inc., and got permission to enter. At the time Officers Gately and Lilly were on duty at the fencing operation. From a window Gately saw Hazel open the trunk of his automobile, remove a long item, and wrap a cloth around it. Then Brooks and Hazel entered the warehouse together. Hazel was carrying the long item wrapped in a cloth, and Gately recognized him as a P.F.F. customer he had seen several times before. Hazel placed on the counter the long item he was carrying, unwrapped it, and offered it for sale. It was a 12-gauge sawed-off shotgun. A little later Hazel placed four shotgun shells on the counter for sale with the weapon. Brooks said the shotgun was his and it was for sale. He said he had fired it a couple of times, it held five shells, and it had already been sawed off when he obtained it. The officers paid Brooks $125.00 for the shotgun and gave Hazel $10.00 "for bringing in a new customer." The videotape of the entire transaction was played to the jury and we have seen it.

Brooks testified that on February 5 he was innocently walking towards his house when Hazel came along in an automobile and asked him to take a ride "over to Northeast". Brooks accepted the invitation because he thought he would visit a friend who lived in that area. Hazel did not tell Brooks why he was going to Northeast, nor did he explain his call from the telephone booth, or tell Brooks what was in the package he took out of the trunk of the car. As they were entering the warehouse, however, Hazel asked him to say the wrapped item was his "so he could get some money". Brooks did not know what the item was, but agreed to go along with Hazel's request. When he got inside the warehouse he saw a man with a gun pointed at him and he was afraid, so he went along with Hazel's instructions and when he saw that the item on the counter was a sawed-off shotgun he said he had fired it before, and that it was sawed off when he acquired it. He denied that he had ever possessed a shotgun, and swore that he turned over the entire proceeds of the sale, $125.00, to Hazel.

Hazel testified that he first became familiar with the P.F.F. operation in October 1975. He said he found he could earn money by bringing new customers to the warehouse; that Officer Lilly said he "would pay me to bring people up there", $20.00 per person brought in. He averred that on his second visit Lilly lent him $200.00 with the warning that harm could come to him if he did not repay the money. Throughout that fall and winter he would return to the warehouse with items to sell. Sometimes he came alone, sometimes with a new customer. Whenever he entered alone, he said, there was a potential new customer, whom he did not know well enough to trust, waiting in the car outside. He testified that all his sales to P.F.F., Inc., were made for others, he was only a middleman trying to repay his loans.

"Numerous times" said Hazel, Lilly asked him to bring in people with guns, saying "he would pay top dollar for them." This led to the visit to the warehouse with Brooks on February 5. According to Hazel

he was driving in his car when Brooks called and "started waving". When Hazel "pulled over" Brooks told him he had a shotgun he wanted to sell, his asking price being between $100.00 and $125.00. Hazel telephoned P.F.F., made arrangements for the two to go there, and Brooks went and got the shotgun and four shells. The gun, which Brooks had wrapped in a red blanket, was put into the car and the two men proceeded to the warehouse. Hazel carried the gun and shells because P.F.F. had instructed him that if he "ever got anybody with a gun, to make sure it wasn't loaded and to bring it upstairs himself". According to Hazel, when the sale was made Brooks received $125.00 which he kept. Lilly paid Hazel $10.00 "because they said I had owed money . . . and that they would give me another $10.00 the next time Mr. Brooks came to see them".

In rebuttal Officer Lilly denied ever having lent $200.00 to Hazel. He explained that small loans of about $20.00 were occasionally made to customers to provide a reason for the undercover police to demand identifications and telephone numbers; also the officers offered as much as $20.00 to old customers who brought in new ones.

On this appeal both appellants contend that the District Court erred by failing to explore the extent to which prospective jurors were affected by pretrial publicity. As a corollary of this argument the appellants say the court on its own motion should have granted a continuance. In addition Hazel argues that in his case the court should have instructed the jury on entrapment. Brooks also contends that the court should have severed the trials of the two defendants and that it was error to receive in evidence a portion of the videotape on which Brooks stated that his main "hustle" was stealing. Finding that none of these contentions warrants reversal we affirm.

## PRETRIAL PUBLICITY

Hundreds of persons who had done business with P.F.F., Inc., were invited to a party at the warehouse on February 28, 1976. Once inside the doors they were arrested and told that the men who had posed as underworld figures were really police officers and FBI agents. This party was dubbed "Operation Sting", and given extensive coverage in newspapers and magazines and on radio and television broadcasts. Before the voir dire of prospective jurors for the Brooks-Hazel trial began counsel for Hazel called the court's attention to this publicity, noting that Hazel's name in particular appeared in at least one newspaper article. Counsel stated that if examination of the prospective jurors confirmed his suspicions of prejudice he would ask for an extended continuance; but, said counsel, "I would not ask the Court to rule on that now, [but] to see what we come up with in the voir dire". At the conclusion of voir dire counsel did not ask for a continuance or any other relief. Nevertheless, Brooks and Hazel now contend that they were denied a fair trial because the voir dire questions were not probing enough to uncover the jurors' prejudices and because the court did not grant a continuance on its own motion.

Having read the transcript we find the examination of prospective jurors was adequate. The court questioned fifty-five prospective jurors before empaneling twelve regular jurors and two alternates. The court explained to the jurors that the case "resulted from a police operation known as P.F.F., Inc., the store-front operation or fence or Sting operation group". Then the court directed any prospective jurors who "have either read about it or seen it on television or heard about it on the radio, whatever, [to] line up in front of the jury box and approach the bench one at a time". All but twelve veniremen indicated they had heard of the operation and consequently they were questioned individually at the bench out of the hearing of the other jurors. No veniremen had heard anything about Hazel or Brooks. Only four had formed an opinion as to the guilt of persons arrested in the Sting operation and they were excused by the court. All who had previously been on the jury in another "Sting" trial were excused. All the jurors

chosen to sit averred that they could consider the case fairly and impartially.

■ The method and manner of conducting a voir dire are left to the discretion of the trial judge. *United States v. Bryant,* 153 U.S.App.D.C. 72, 471 F.2d 1040 (1972), *cert. denied,* 409 U.S. 1112, 93 S.Ct. 923, 34 L.Ed.2d 693 (1973); *United States v. Liddy,* 166 U.S.App.D.C. 95, 509 F.2d 428 (1974), *cert. denied,* 420 U.S. 911, 95 S.Ct. 833, 42 L.Ed.2d 842 (1975). Here we find no indication that the District Court improperly exercised its discretion. The examination of the prospective jurors developed no significant possibility of prejudice against the defendants, and there was no reason to believe that further cross examination would have thrown more light on the matter. As was the case in *United States v. Chapin,* 169 U.S.App.D.C. 303, 515 F.2d 1274, *cert. denied,* 423 U.S. 1015, 96 S.Ct. 449, 46 L.Ed.2d 387 (1975), the pretrial publicity had not focused on Hazel and Brooks; so far as the talesmen were concerned they had neither name nor fame. There was no error in the court's conduct of the voir dire, and no reason for the court to grant a continuance sua sponte.

## ENTRAPMENT

■ Hazel contends that he was entitled to an instruction on entrapment, in view of his testimony that the police officers paid him for bringing in new customers and asked him to bring in people with guns. We think however that the evidence, taken in the light most favorable to Hazel, requires us to reject his contention.

Hazel testified that he became acquainted with P.F.F. in October 1975 when he went there with two friends who were selling stolen credit cards. At this time the P.F.F. man explained the fencing operation to him. Thereafter he returned some eighteen times, always on his own initiative. According to his testimony his possession of the sawed-off shotgun was instigated by Brooks, who hailed him on the public street and requested his assistance in effecting a sale. We think these facts negate even a colorable contention that Hazel was an in-nocent person instigated to crime by the police, who implanted in his mind the disposition to violate the law. In the absence of evidence of such instigation the District Court properly refused to instruct on entrapment. *See Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976); *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1673, 36 L.Ed.2d 366 (1973); *Sorrells v. United States,* 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932).

## SEVERANCE

Although Rule 12(b)(5) Fed.R.Crim.P. provides that a request for severance must be presented before trial, Brooks made no such request until the government had completed its case in chief and Brooks had testified in his own defense. At this time, when Hazel's counsel indicated to the court that Hazel would deny ownership of the shotgun and impute it to Brooks, counsel for Brooks moved for a mistrial and a severance. He argued that Hazel's defense was inconsistent with, and prejudicial to, the denial by Brooks that he either owned or possessed the shotgun. The court denied the motions, commenting that "your motion for a severance is a little late".

■ Assuming that the court in its discretion might have granted Brooks relief from the requirement of Rule 12(b)(5) we hold that the court was right in refusing to do so. Brooks and Hazel were jointly charged with the possession of the sawed-off shotgun. The joinder was of course proper, Rule 8(b) Fed.R.Crim.P., and the general rule is that defendants jointly indicted will be tried together. The case for the government was that Hazel had actual possession of the shotgun, Brooks had constructive possession, and the two were acting in concert in selling the weapon to P.F.F., Inc. That one of them in mid-trial proposed to contradict the testimony of the other did not require a severance. If this were not so, then any jointly indicted defendants would have the absolute power to abort a trial by the expedient of proffering inconsistent testimony after the trial begins.

The motion for severance was addressed to the discretion of the trial judge, and the latitude of the judge's discretion was wide. *United States v. Robinson,* 139 U.S.App.D.C. 286, 432 F.2d 1348 (1970). Denial of a request for severance will not be reversed on appeal absent a clear showing of abuse of discretion. *Opper v. United States,* 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954); *United States v. Peterson,* 173 U.S.App.D.C. 49, 522 F.2d 661 (1975). Furthermore, in order to demonstrate abuse of discretion by a trial judge it is not enough to show that codefendants whose defenses were inconsistent were tried together. There must be a showing of danger "that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty." *Rhone v. United States,* 125 U.S. App.D.C. 47, 48, 365 F.2d 980, 981 (1966); *United States v. Robinson, supra.* Here it was not the conflict alone that resulted in the conviction of both defendants. Although Hazel's testimony did contradict Brooks' denial of any possessory interest in the shotgun, Brooks was also contradicted by the videotape recording of his claim of ownership and of his demeanor when the sale was made. In addition the jury might well have found his testimony incredible on its face. That he would have had a better chance of acquittal had he been tried alone did not justify a severance. *United States v. Gorham,* 173 U.S.App.D.C. 139, 143, 523 F.2d 1088, 1092 (1975); *United States v. Wilson,* 140 U.S.App.D.C. 220, 227, 434 F.2d 494, 501 (1970); *Robinson v. United States,* 93 U.S.App.D.C. 347, 349, 210 F.2d 29, 32 (1954).

Finally, we note that the district judge carefully instructed the jury:

You should give separate consideration and render separate verdicts with respect to each defendant. Each defendant is entitled to have his guilt or innocence of the crime determined from his own conduct and from the evidence which applies to him as if he were being tried alone. The guilt or innocence of any one defendant should not control or influence your verdict respecting the other defendant. You must find either one or both of the defendants guilty or not guilty. (TR. 346)

## FAILURE TO EXPURGATE THE VIDEOTAPE

Our final problem arises because the prosecutor declined to excise from the videotape a dialogue in which Brooks asserted that his main "hustle" was stealing. This dialogue took place after the sale of the shotgun was completed and Brooks and Hazel had been paid and were preparing to leave the P.F.F. office. After some discussion of a man who had been killed and whose body was found in a trashcan Hazel remarked that he stuck to what he liked to do best, he didn't "go killing people". The following then ensued:

LILLY: What do you like to do best?

HAZEL: I like to make a (catch?) with my brain.

LILLY: (to Brooks) How about you? (to Hazel). Yea, brain. That's why you got (inaudible) before.

BROOKS: I like to use my head and my hands.

LILLY: Yea, but what is your main hustle?

BROOKS: (pause) Stealing.

LILLY: Stealing, uh?

BROOKS: I like stealing.

LILLY: That's your main hustle, stealing.

BROOKS: Rob.

LILLY: Anything.

BROOKS: Anything of value.

LILLY: Uh, huh.

BROOKS: Anything where I see I can get at least fifty. I ain't going to be going to jail for no five dollars.

LILLY: (inaudible) Dig it.

BROOKS: If I can get quantity, I get quantity.

LILLY: OK. You came to the right place. I'm the best fence around. I'm a good deal. You'll enjoy me.

(Appellant's Br. at 11–12)

The quoted portion of the tape could easily have been excised, and a cautious prosecu-

tor, considering the great strength of his case on the other evidence, might well have eliminated it. Nevertheless we conclude that the admission of the dialogue was not fatally prejudicial.

Brooks averred that he was an innocent who had no warning that Hazel was taking him to the office of a fence to negotiate the sale of a sawed-off shotgun. He testified he claimed ownership of the shotgun and cooperated with Hazel because he was afraid. His statement to Lilly that his predilection was for stealing directly contradicted this profession of innocence by indicating that the office of a fence was his natural habitat. For this purpose we think the statement was admissible. It did not fall within the rationale of *United States v. Wiggins,* 166 U.S.App.D.C. 121, 509 F.2d 454 (1975) because it had no tendency to show that Brooks possessed a sawed-off shotgun. In the *Wiggins* case, when the defendant was on trial for one murder the prosecutor introduced in evidence his statement that he had committed three other unrelated murders. We reversed, because "the jury were left free to reason that because Wiggins had killed others he probably killed Davis." *Id.,* 166 U.S.App.D.C. at 129, 509 F.2d at 462 (1975). Here there was no reasonable possibility that the jury would reason that Brooks' possession of an unregistered sawed-off shotgun followed from his "hustle" of stealing.

In conclusion we repeat what we thought we had made clear in *United States v. Wiggins, supra* :[1] in the trial of a defendant for one offense evidence of other offenses he has committed is not admissible merely because he mentioned them in a voluntary statement. Prosecutors tempted to paint the lily in presenting their cases should bear this in mind.

*The Judgments are Affirmed.*

SPOTTSWOOD W. ROBINSON, III, Circuit Judge, dissenting in part:

I readily concur in the court's treatment of appellants' common pretrial-publicity contention and the severance claim advanced by Brooks. I cannot agree with my colleagues, however, that Hazel was not entitled to an instruction on possible entrapment.[1] Nor do I share their conclusion that the District Court's failure to excise Brooks' professions on stealing from the Government's videotape was not reversible error.[2] On these issues, therefore, I respectfully dissent.

### I

Apparently discerning no indication that the Government may itself have incited Hazel's possession of the sawed-off shotgun,[3] the court holds that Hazel was properly denied an entrapment instruction. I believe, however, that the evidence fairly raised a substantial factual question whether the conduct of the PFF staff constituted instigation of the offense.[4] Because proof

---

1. Speaking of the *Wiggins* decision the district judge said "I would like the Court of Appeals to have another look at it." (TR. 8)

1. Discussed Part I *infra.*

2. Discussed Part II *infra.*

3. Majority Opinion (Maj.Op.) at —— of 185 U.S.App.D.C., at 138 of 567 F.2d.

4. Inducement is usually demonstrated by evidence that the accused was subjected to appreciable pressure, such as threats, promises or urgent pleas based on need, sympathy or friendship. See *United States v. Boone,* 177 U.S.App.D.C. 265, 266–267, 543 F.2d 412, 413–414 (1976); *Fletcher v. United States,* 111 U.S. App.D.C. 192, 194, 295 F.2d 179, 181 (1961), *cert. denied,* 368 U.S. 993, 82 S.Ct. 613, 7

L.Ed.2d 530 (1962). Mere solicitation, however, does not establish inducement for entrapment purposes. See *Lopez v. United States,* 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963); *Smith v. United States,* 118 U.S.App. D.C. 38, 43–44, 331 F.2d 784, 789–790 (1964); *United States v. DeVore,* 423 F.2d 1069 (4th Cir.), *cert. denied,* 402 U.S. 950, 91 S.Ct. 1604, 29 L.Ed.2d 119 (1971); *United States v. Reyno-so-Ulloa,* 548 F.2d 1329 (9th Cir. 1977). The production of "some" evidence of Government instigation suffices to generate a question for the jury. *Lopez v. United States, supra,* 373 U.S. at 435, 83 S.Ct. at 1385, 10 L.Ed.2d at 468; *United States v. Anglada,* 524 F.2d 296 (2d Cir. 1975); *United States v. Braver,* 450 F.2d 799, 805 (2d Cir. 1971), *cert. denied,* 405 U.S. 1064, 92 S.Ct. 1493, 31 L.Ed.2d 794 (1972). But even when improper governmental conduct is estab-

of Hazel's predisposition to commit the offense was not uncontradicted, he was entitled to consideration of his entrapment defense by the jury.

The defense of entrapment has long been imbedded in federal jurisprudence.[5] The general principles need be recounted only briefly. "The function of law enforcement is the prevention of crime and the apprehension of criminals."[6] and "[c]riminal activity is such that stealth and strategy are necessary weapons in the arsenal of the police officer."[7] So, "the fact that officers or employees of the Government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution. Artifice and stratagem may be employed to catch those engaged in criminal enterprises."[8] But, since the law-enforcement function "does not include the manufacturing of crime,"[9] a different result must ensue "when the criminal design originates with the officials of the Government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute."[10] For "Congress could not have intended that

its statutes were to be enforced by tempting innocent persons into violations."[11]

The task at hand, then, is to ascertain whether the evidence as a whole was conducive to an inference—should a jury see fit to draw it—that delivery of the shotgun was the progeny of the Government rather than Hazel. "Entrapment occurs only when the criminal conduct was 'the product of the *creative* activity' of law-enforcement officials. . . . To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal."[12] I think there was evidence in this case enabling the jury to conclude either way.

Essentially, Hazel's testimony viewed beneficially to him,[13] demonstrated that PFF personnel undertook by implied threats to induce Hazel's delivery of weapons as repayment of loans extended by PFF. Hazel avowed that before his second visit to the PFF establishment, he arranged to borrow $200 from PFF[14] and that, in consumating the transaction, PFF warned

lished, an entrapment instruction still may not be warranted if the prosecution has adduced uncontradicted evidence of predisposition. See note 21 *infra* and accompanying text.

5. See cases cited *infra* notes 6–12.

6. *Sherman v. United States*, 356 U.S. 369, 372, 78 S.Ct. 819, 820, 2 L.Ed.2d 848, 851 (1958).

7. *Id.*, 78 S.Ct. at 820–821, 2 L.Ed.2d at 851.

8. *Sorrells v. United States*, 287 U.S. 435, 441, 53 S.Ct. 210, 212, 77 L.Ed. 413, 416 (1932). "The appropriate object of this permitted activity, frequently essential to the enforcement of the law, is to reveal the criminal design; to expose the illicit traffic, the prohibited publication, the fraudulent use of the mails, the illegal conspiracy, or other offenses, and thus to disclose the would-be violators of the law." *Id.* at 441–442, 53 S.Ct. at 212, 77 L.Ed. at 416–417. See also note 20, *infra*.

9. *Sherman v. United States, supra* note 6, 356 U.S. at 372, 78 S.Ct. at 820, 2 L.Ed.2d at 851.

10. *Sorrells v. United States, supra* note 8, 287 U.S. at 442, 53 S.Ct. at 212–213, 77 L.Ed. at 417. Thus, "the principal element in the defense of entrapment [is] the defendant's predis-

position to commit the crime." *United States v. Russell*, 411 U.S. 423, 433, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366, 374 (1973).

11. *Sherman v. United States, supra* note 6, 356 U.S. at 372, 78 S.Ct. at 821, 2 L.Ed.2d at 851.

12. *Id.* at 372–373, 78 S.Ct. at 821, 2 L.Ed.2d at 851 quoting *Sorrells v. United States, supra* note 8, 287 U.S. at 451, 53 S.Ct. at 216, 77 L.Ed. at 422 (emphasis in original). See also *United States v. Russell, supra* note 10, 411 U.S. at 434–436, 93 S.Ct. at 1644–1645, 36 L.Ed.2d at 375–376.

13. In determining whether to instruct the jury on entrapment, the court must consider the evidence in the light most favorable to the accused. *United States v. Boone, supra* note 4, 177 U.S.App.D.C. at 267, 543 F.2d at 414; *United States v. Anglada, supra* note 4, 524 F.2d at 298.

14. Trial Transcript (Tr.) 250. The PFF officer involved denied ever having made a $200 loan to Hazel. Tr. 309. According to Hazel, the $200 loan was the first of several he obtained from PFF. Tr. 246.

Hazel that failure to repay might provoke drastic consequences:

> And as far as me paying them back, they asked me what happens when somebody don't pay their money back, you know.
>
> Q. Did they indicate to you what would happen, or did you . . .?
>
> A. They indicated further that they would send somebody out and 'They would find them and they could rub them out.'[15]

As payment of the debt owed to PFF, Hazel was expected to introduce patrons to the operation:

> Well, I paid it back as far as bringing other people up there. Sometimes they would take it out of the money that I owed them. They would say that I owed them, and they'd take it out, just by saying, 'Well, you owed me a certain amount of money.'[16]

Additionally, on various occasions PFF urged strongly that Hazel seek out "people with guns" to sell.[17] And when Hazel eventually produced Brooks, who assertedly was offering his shotgun for sale, PFF instructed Hazel to bring the gun in personally.[18]

Had a properly instructed jury credited this evidence, it might justifiably have concluded that the Government had applied undue pressure[19] in an attempt to induce Hazel to commit criminal acts. By utilizing Hazel's indebtedness as leverage effectively to demand that Hazel channel sellers of arms to the PFF operation, the Government would have exceeded the permissible bounds of artifice and strategem.[20]

Even when, however, the threshold requirement of proof of Government importunity is satisfied, the jury need not be instructed to consider entrapment if there is uncontradicted evidence that the accused was predisposed to commit the type of crime involved.[21] That is not the situation here although, to be sure, the Government's evidence of predisposition is formidable. As the court points out,[22] Hazel first visited PFF in the company of two friends who were passing stolen credit cards. After explaining the nature of the operation to Hazel, a PFF agent proposed that Hazel bring people to the establishment "to fence" in exchange for money.[23] Thereafter, Hazel inquired about, and voluntarily entered into, the loan arrangement. As my col-

---

15. Tr. 245.

16. Tr. 247.

17. Tr. 248, 257–258.

18. Tr. 251–252.

19. See note 4 *supra*.

20. Mere deception does not rise to entrapment. As already mentioned, stealth and strategem are necessary and acceptable police methods. See *United States v. Russell, supra* note 10, 411 U.S. at 432, 93 S.Ct. at 1643, 36 L.Ed.2d at 373–374; *Sherman v. United States, supra* note 6, 356 U.S. at 372, 78 S.Ct. at 820–821, 2 L.Ed.2d at 851; *Lopez v. United States, supra* note 4, 373 U.S. at 434, 83 S.Ct. at 1385, 10 L.Ed.2d at 468; *Sorrells v. United States, supra* note 8, 287 U.S. at 441, 53 S.Ct. at 212, 77 L.Ed. at 416; *Smith v. United States, supra* note 4, 118 U.S.App.D.C. at 43, 331 F.2d at 789; *Trent v. United States*, 109 U.S.App.D.C. 152, 153, 284 F.2d 286, 287 (1960), *cert. denied,* 365 U.S. 889, 81 S.Ct. 1035, 6 L.Ed.2d 199 (1961). But it bears repeating, as the Supreme Court admonished in *Sherman, supra* note 4, that law enforcement methods may not extend to the "manufacturing of crime." 356 U.S. at 372, 78

S.Ct. at 821, 2 L.Ed.2d at 851. See text *supra* at notes 6–12.

21. *United States v. Boone, supra* note 4, 177 U.S.App.D.C. at 267, 543 F.2d at 414, quoting *United States v. Anglada, supra* note 4, 524 F.2d at 298; *United States v. Riley*, 363 F.2d 955, 959 (2d Cir. 1966). See *Johnson v. United States*, 115 U.S.App.D.C. 63, 317 F.2d 127 (1963). *Cf. Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976) (plurality opinion) (no entrapment instruction required when predisposition was uncontested). In *United States v. Russell, supra* note 12, the Court ruled against the defendant's claim that, despite his conceded predisposition, he was entrapped as a matter of law due to the degree of governmental participation in the offense. The jury had been instructed on entrapment, however; thus, the Court addressed only the question whether the accused had been entrapped as a matter of law.

22. Maj.Op. at ⸺ of 185 U.S.App.D.C., at 138 of 567 F.2d.

23. Tr. 244.

leagues note,[24] Hazel returned about 18 times on his own initiative to transact business with PFF.

Nevertheless, the visit with Brooks was the first occasion on which Hazel mediated a sale of a weapon to PFF, and it followed persistent requests to "bring people with guns."[25] The evidence suggests that these entreaties commenced after Hazel allegedly had procured the loans obligating him to PFF. Moreover, Hazel testified that he would not have personally handled the shotgun were it not for the specific instructions given him by the PFF agent.[26] Thus, even though there may have been predisposition with respect to traded items other than weapons, the jury might have concluded that Hazel's criminal bent did not extend to possession or trafficking in firearms.[27] That possessing of a shotgun, whether stolen or not, has a magnitude wholly different from possession of other chattels is attested by its independent statutory regulation, which underlay appellants' convictions.[28]

I do not say that the evidence establishes entrapment as a matter of law;[29] on the contrary, I can readily say that it does not. But the issue before us is simply whether Hazel's entrapment defense should have been submitted to the trier of fact, and for such issues we have recently endorsed the Second Circuit's standard:

> [T]he production of *any* evidence negating propensity, whether in cross-examination or otherwise, requires submission to the jury, however unreasonable the judge would consider a verdict in favor of the defendant to be.[30]

Indubitably, the jury could have rejected Hazel's account of PFF's conduct and his claim of lack of predisposition. Still, consideration of matters of credibility by the trier of fact is indispensably appropriate.[31] Hazel's version of the shotgun affair, if believed, interposed the elements of entrapment into commission of the offense on trial, and the District Court erroneously declined to honor his request for an instruction on that score.

**24.** Maj.Op. at —— of 185 U.S.App.D.C., at 138 of 567 F.2d.

**25.** Tr. 248, 257–258.

**26.** Tr. 151–152, 304. In addition to evidence actually admitted on the entrapment issue, other evidence tending to establish an indirect threat to those indebted to PFF was barred by the District Court apparently out of disapproval of Hazel's entrapment defense. Tr. 313–315.

**27.** *See United States v. Brown*, 185 U.S.App. D.C. —— at ——, 567 F.2d 119 at 120 (1977) ("[t]he entrapment defense focuses on the question whether defendant was predisposed to commit crimes of the *nature* charged" (emphasis supplied)); *Carbajal-Portillo v. United States*, 396 F.2d 944 (9th Cir. 1968) (clear predisposition to sell heroin in Mexico did not evince predisposition to sell the same heroin in the United States, in violation of independent United States law).

**28.** See 26 U.S.C. § 5861(d) (1970); *United States v. Mayo*, 162 U.S.App.D.C. 171, 498 F.2d 713 (1974).

**29.** Compare *Johnson v. United States, supra* note 21; *United States v. Dickens*, 524 F.2d 441 (5th Cir. 1975), *cert. denied*, 425 U.S. 994, 96 S.Ct. 2208, 48 L.Ed.2d 819 (1976); *United States v. Jackson*, 539 F.2d 1087 (6th Cir.

1976); *United States v. Spain*, 536 F.2d 170, 173 (7th Cir.), *cert. denied*, 429 U.S. 833, 97 S.Ct. 96, 50 L.Ed.2d 97 (1976); *United States v. Gardner*, 516 F.2d 334, 344 (7th Cir.), *cert. denied*, 423 U.S. 861, 96 S.Ct. 118, 46 L.Ed.2d 89 (1975); *United States v. Robinson*, 539 F.2d 1181 (8th Cir. 1976), *cert. denied*, 429 U.S. 1101, 97 S.Ct. 1124, 51 L.Ed.2d 550 (1977).

**30.** *United States v. Boone, supra* note 4, 177 U.S.App.D.C. at 268, 543 F.2d at 415, quoting *United States v. Anglada, supra* note 4, 524 F.2d at 298 (emphasis supplied).

**31.** In *United States v. Riley, supra* note 21, 363 F.2d at 958, the Second Circuit proclaimed:

> Cases like this frequently present an issue of credibility as between the agent and the defendant . . . ; resolution of such an issue is peculiarly within the jury's province. If it credits the defendant's story in whole or in part, the ensuing question of whether the Government has gone so far in causing the criminal conduct as to take the case outside the definition of the crime and to render punishment an act of injustice, is also highly suitable for determination by a jury, representing "the voice of the country."

Here quoting 2 Pollock & Maitland, History of English Law 623–26 (1898).

**144**

II

I am convinced, too, that Brooks' conviction also was defective. More specifically, I believe the District Court's refusal to exclude that portion of the videotape regarding Brooks' assertion that his "main hustle" is stealing necessitates reversal. My reasons follow.

The limited circumstances in which proof of criminal acts other than the charged offense is allowable are well established. Such evidence is patently inadmissible to prove bad character of the accused for purposes of cultivating an inference that in the instance on trial he acted accordingly.[32] And extrinsic evidence of misconduct not culminating in conviction may not be introduced to impeach the accused.[33] When relevant, other-crimes evidence *may* be admitted for some other purposes,[34] however, and

one is to prove an absence of mistake or accident.[35] Thus the court correctly concludes[36] that because Brooks' videotaped statement that his "main hustle" is stealing tended to show that he was comfortable inside the office of a fence, it was pertinent to the issue whether his activities at PFF were coolly deliberate or feigned out of fear.

But simply to demonstrate the relevance of other-crimes evidence to a material issue is not to end the inquiry. The probative weight of the evidence and the necessity for its introduction must be balanced against the danger of undue prejudice to the accused.[37] In my view, the disputed segment of the videotape added little to the Government's case but portended grave and unfair prejudice to Brooks.

**32.** Fed.R.Evid. 404(b). See, *e. g., Michelson v. United States,* 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948); *United States v. Lewis,* 157 U.S.App.D.C. 43, 48, 482 F.2d 632, 637 (1973); *United States v. Fench,* 152 U.S.App.D.C. 325, 330–331, 470 F.2d 1234, 1240 (1972), *cert. denied,* 410 U.S. 909, 93 S.Ct. 964, 35 L.Ed.2d 271 (1973); *United States v. Bobbitt,* 146 U.S.App.D.C. 224, 226, 450 F.2d 685, 688 (1971); *Bradley v. United States,* 140 U.S.App.D.C. 7, 12, 433 F.2d 1113, 1117–1118 (1969); *Drew v. United States,* 118 U.S.App.D.C. 11, 15, 331 F.2d 85, 89 (1964); C. McCormick, Evidence § 190, at 447 (2d ed. 1972); 1 J. Wigmore, Evidence §§ 192–194 (3d ed. 1940).

**33.** Fed.R.Evid. 608(b). See, *e. g., Tinker v. United States,* 135 U.S.App.D.C. 125, 128 n. 16, 417 F.2d 542, 545 n. 16, *cert. denied,* 396 U.S. 864, 90 S.Ct. 141, 24 L.Ed.2d 118 (1969); *United States v. Turquitt,* 557 F.2d 464, 471 (5th Cir. 1977); *United States v. Banks,* 520 F.2d 627, 631 (7th Cir. 1975); *United States v. Norman,* 402 F.2d 73, 77 (9th Cir. 1968), *cert. denied,* 397 U.S. 938, 90 S.Ct. 949, 25 L.Ed.2d 119 (1970); *United States v. Estell,* 539 F.2d 697, 700 (10th Cir.), *cert. denied,* 429 U.S. 982, 97 S.Ct. 497, 50 L.Ed.2d 592 (1976).

**34.** Fed.R.Evid. 404(b) provides: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." See, *e. g., United States v. Fench, supra* note 32, 152 U.S.App.D.C. at 331, 470 F.2d at 1240; *Robinson v. United States,* 148 U.S.App.D.C. 58, 67 & n. 63, 459 F.2d 847, 856 & n. 63 (1972); *Drew v.*

*United States, supra* note 32, 118 U.S.App.D.C. at 16, 331 F.2d at 90; *United States v. Bowdach,* 501 F.2d 220, 227 (5th Cir. 1974), *cert. denied,* 420 U.S. 948, 95 S.Ct. 1331, 43 L.Ed.2d 426 (1975).

**35.** See authorities cited *supra* note 34.

**36.** Maj.Op. at —— of 185 U.S.App.D.C., at 140 of 567 F.2d.

**37.** Fed.R.Evid. 403, 404(b) (Note of Advisory Committee on Proposed Rules). See, *e. g., United States v. Wiggins,* 166 U.S.App.D.C. 121, 129, 509 F.2d 454, 462 (1975); *United States v. Anderson,* 165 U.S.App.D.C. 390, 406–407, 509 F.2d 312, 328–329 (1974), *cert. denied,* 420 U.S. 991, 95 S.Ct. 1427, 43 L.Ed.2d 672 (1975); *United States v. Fench, supra* note 32, 152 U.S.App.D.C. at 331, 470 F.2d at 1240; *Robinson v. United States, supra* note 34, 148 U.S.App.D.C. at 67–68, 459 F.2d at 856–857; *Bradley v. United States, supra* note 32, 140 U.S.App.D.C. at 13, 433 F.2d at 1119; *United States v. Chestnut,* 533 F.2d 40, 49 (2d Cir. 1975), *cert. denied,* 429 U.S. 829, 97 S.Ct. 88, 50 L.Ed.2d 93 (1976); *United States v. Turquitt, supra* note 33; *United States v. Ostrowsky,* 501 F.2d 318, 321 (7th Cir. 1974); *United States v. Grammer,* 513 F.2d 673, 677 (9th Cir. 1975); C. McCormick, *supra* note 32, § 190, at 453 ("there is danger that if the judges, trial and appellate, content themselves with merely determining whether the particular evidence of other crimes does or does not fit in one of the approved classes, they may lose sight of the underlying policy of protecting the accused against unfair prejudice").

Evidence suggesting Brooks' general familiarity with fencing operations could hardly have touched strongly on his sense of security at PFF. Apparently never having been to the warehouse before, Brooks was greeted by a gun-bearing agent when he arrived with Hazel. Hence, Brooks' prior experience with other fences was not substantially relevant to whether he was intimidated by the conditions at PFF. Moreover, the Government had direct evidence more persuasive of the state of Brooks' composure on the PFF premises, for the footage of tape depicting the sale of the shotgun recorded graphically and exactly for the jury's observation Brooks' demeanor at the critical moments. Thus, instead of relying on attenuated inferences, the jury could have ascertained first-hand whether Brooks acted nervously or with self-assurance.

Aside from its minimal probative value as to absence of mistake, Brooks' statement that he steals may have significantly aroused extralegal feelings on the part of the jury. Any doubts on the case overall may have been resolved against Brooks, not because of any objective proof that he was guilty of the crime charged, but because of the jury's belief that he was a thief and deserved punishment on that basis alone.[38]

As we have observed before, evidence of other misconduct " 'may result in casting such an atmosphere of aspersion and disrepute about the defendant as to convince the jury that he is an habitual lawbreaker who should be punished and confined for the general good of the community.' "[39] Only when firmly persuaded of the substantial probative worth of other-crimes evidence[40] should we tolerate the risk of prejudice naturally and normally attending its admission.

Moreover, even if the challenged videotape segment were admissible to establish absence of mistake, its use was not so restricted by the District Court. Although the court warned the jury not to consider evidence of *Hazel's* other criminal activities in reaching a verdict,[41] Brooks was not afforded a comparable instruction. The jury might have deemed this contrast an implicit authorization to treat the damaging statement as they pleased. Not having been admonished otherwise, they may well have looked to this indication of Brooks' general criminal disposition in assessing his involvement in the crime charged. From evidence of other misconduct an inference of guilt, which may or may not appear logical from the perspective of judicial hindsight, will very commonly be embraced by a lay jury.[42]

**38.** See *Michelson v. United States, supra* note 32, 335 U.S. at 475–476, 69 S.Ct. at 218–219, 93 L.Ed. at 173–174; *Pinkney v. United States,* 124 U.S.App.D.C. 209, 211, 363 F.2d 696, 698 (1966); *Harper v. United States,* 99 U.S.App. D.C. 324, 325, 239 F.2d 945, 946 (1956); *United States v. Parker,* 469 F.2d 884, 890–891 (10th Cir. 1973).

**39.** *Pinkney v. United States, supra* note 38, 124 U.S.App.D.C. at 211, 363 F.2d at 698, quoting *Richards v. United States,* 89 U.S.App.D.C. 354, 357, 192 F.2d 602, 605 (1951), *cert. denied,* 342 U.S. 946, 72 S.Ct. 560, 96 L.Ed. 703 (1952).

**40.** See authorities cited *supra* in note 37.

**41.** Tr. 343.

**42.** See *Bradley v. United States, supra* note 32, 140 U.S.App.D.C. at 12, 433 F.2d at 1118; *United States v. Foutz,* 540 F.2d 733, 736 (4th Cir. 1976) ("to the layman's mind a defendant's criminal disposition is logically relevant to his guilt or innocence of a specific crime"); *Bullard v. United States,* 395 F.2d 658, 660 (5th

Cir. 1968). And the probative force of such evidence with respect to the defendant's criminal responsibility for the crime charged may well be overrated by the jury. Thus, in *Michelson v. United States, supra* note 32, the Supreme Court observed:

> The state may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge. The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of the issues, unfair surprise and undue prejudice.

335 U.S. at 475–476, 69 S.Ct. at 218–219, 93 L.Ed. at 173–174, citing 1 J. Wigmore, Evidence § 57 (3d ed. 1940) (footnotes omitted).

Thus, on this general ground, I disagree that "there was no reasonable possibility that the jury would reason that Brooks' possession of an unregistered sawed-off shotgun followed from his 'hustle' of stealing." [43]

Even more directly, the jury may have inferred from Brooks' reference to his "hustle" that he was endeavoring to pass a stolen shotgun. The jury may have further reasoned that the gun was not registered precisely because it was stolen. Even though, as my colleagues implicitly acknowledge, this analytical chain is too attenuated to support admission of the evidence,[44] there is an appreciable danger that the jury leaped to the forbidden conclusion.

Lastly, without a limiting instruction the jury may also have relied upon the statement in assessing Brooks' credibility as a witness. The consequence of that enterprise, proscribed by the Federal Rules of Evidence,[45] would have been severe given that Brooks' case depended upon the jury's acceptance of his version of the recorded transaction and the events preceding it.

The prejudice to Brooks was compounded by repeated reference to the "main hustle" statement at trial. The videotape was played during the Government's case in chief,[46] and again during the prosecutor's cross-examination and impeachment of Brooks.[47] To mitigate the effect of the statement, defense counsel was compelled to mention it on Brooks' direct examination.[48] The Government reminded the jury in closing argument that Brooks had said that "he would take anything, $50 or more." [49] And the jury may have been given the tape for use in its deliberations.[50]

In my view, then, the District Court erred in not excluding the unduly prejudicial segment of the videotape. The court concedes that it "could easily have been excised." [51] Even if the tape had been admissible intact to serve the circumscribed purpose that the court indulges it,[52] failure to instruct the jury to consider it only for that purpose was harmful error.[53]

Because I am persuaded that the convictions of both appellants are fatally flawed, I would reverse the convictions and remand these cases to the District Court for new trials.

---

**43.** Maj.Op. at —— of 185 U.S.App.D.C., at 140 of 567 F.2d.

**44.** See text accompanying note 43 *supra.*

**45.** See note 33 *supra* and accompanying text.

**46.** Tr. 45.

**47.** Tr. 212.

**48.** Tr. 176.

**49.** Tr. 321.

**50.** Tr. 317.

**51.** Maj.Op. at —— of 185 U.S.App.D.C., at 139 of 567 F.2d.

**52.** But see text accompanying notes 37–40 *supra.*

**53.** See *United States v. McClain,* 142 U.S.App. D.C. 213, 440 F.2d 241 (1971) (when evidence of other misconduct is admitted for limited purpose, it is plain error to omit cautioning instruction); *Beasley v. United States,* 94 U.S. App.D.C. 406, 409, 218 F.2d 366, 369 (1954), *cert. denied,* 349 U.S. 907, 75 S.Ct. 584, 99 L.Ed. 1243 (1955) (instruction cured error); *United States v. Dansker,* 537 F.2d 40, 58 (3d Cir. 1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977) (instruction diminished potential for prejudice); *United States v. Calvert,* 523 F.2d 895, 907 (8th Cir. 1975), *cert. denied,* 424 U.S. 911, 96 S.Ct. 1106, 47 L.Ed.2d 314 (1976); *cf. United States v. Fleetwood,* 528 F.2d 528, 535–536 (5th Cir. 1976) (repetition of evidence at trial and emphasis placed upon it by the Government was so prejudicial as to make doubtful that any instruction could neutralize the harmful impact).