## STATE v. FRANCIS C. CARY.[1]

February 19, 1915.

Nos. 19,057—(14).

**Grand larceny — evidence — variance.**

1. When an indictment alleges grand larceny in the first degree committed by obtaining "current and genuine money" by fraudulent representations, and the evidence shows that the one defrauded drew a draft on a Missouri bank in favor of a Minnesota bank, and the latter bank honored it and was ready to pay the money to the defendant and he requested two drafts and a deposit credit, there is no fatal variance.

**Same — intent to defraud.**

2. The evidence is insufficient to sustain a conviction of obtaining money by false representations as to the ownership of property with intent to cheat and defraud.

Francis C. Cary, with others, was indicted by the grand jury, tried in the district court for Clay county before Parsons, J., and a

1 Reported in 151 N. W. 186.
128 M.—31.

jury, and convicted of the crime of grand larceny in the first degree. From an order denying defendant's motion for a new trial, he appealed. Reversed.

*Leonard Eriksson,* for appellant.

*Lyndon A. Smith,* Attorney General, *John C. Nethaway,* Assistant Attorney General, and *Christian G. Dosland,* County Attorney, for respondent.

DIBELL, C.

The defendants Francis C. Cary, J. W. Bernardy and O. E. Linderson were indicted in Clay county for grand larceny in the first degree committed by obtaining money by fraudulent representations. Upon a separate trial of Cary he was convicted. He appeals from the order denying his motion for a new trial.

1. The charge in the indictment is that on January 20, 1914, the defendants falsely and fraudulently represented to the J. L. Price Brokerage Co., a corporation, of St. Joseph, Missouri, with intent to cheat and defraud it, that Bernardy was the owner of 13,000 bushels of potatoes in the warehouse at Barnesville; and that by such representations they induced him to purchase 8,250 bushels of potatoes for which he then paid $5,512.50. The indictment alleges that the brokerage company, by reason of the false representations stated, paid to the defendants "the sum of $5,512.50 lawful current and genuine money of the United States of America." No money was actually paid. What was done was this: The brokerage company, through J. L. Price, its principal officer, who was at the time at Barnesville, drew a draft in favor of the Citizens State Bank of Barnesville on the bank of Buchanan County, Missouri. The citizens bank, upon telegraphic authorization from the Missouri bank, honored the draft. Price and the defendant Cary went to the bank to get the proceeds. The cashier asked how they wanted the money. Cary requested one draft for $4,000, another for $1,000, and asked that the balance be deposited to the credit of the Minnesota & Dakota Potato Co. of which Bernardy was in control. The bank gave Minneapolis drafts, which were paid in due course, and made the credit as requested. It is clear that the money would have been

paid Cary by the bank. It was his choice that payment be made otherwise. It is now urged, and it was contended at the trial, that the proof varied from the indictment. There is no suggestion that the defendant was misled or prejudiced. To hold a fatal variance under these circumstances is but another application of a technicality, protecting no right of the accused, but tending to obstruct the administration of justice. We hold that there was not a fatal variance. The case of People v. Dimick, 107 N. Y. 13, 14 N. E. 178, gives some support to our holding.

2. In the fall of 1913 the brokerage company purchased of the Red River Potato Growers Association 8,250 bushels of potatoes for future delivery for the sum of $7,012.50, advancing $1,500 and leaving balance of $5,512.50 to be paid. In January, 1914, trouble arose and Price, representing the brokerage company, came to Barnesville. He met Cary and Bernardy. His claim, sufficiently supported by the evidence, is that they represented to him that Bernardy owned something like 13,000 bushels of potatoes in the warehouse; and that if he would pay $5,512.50 in cash, the amount which he was still owing for his potatoes, and would assign his claim of $1,500 against the association, Bernardy would deliver to him 8,250 bushels of potatoes, the amount of his original purchase. Price took counsel with his attorney, Mr. Hanson of Barnesville, and the sale was made. Price paid the $5,512.50 in the way indicated. Bernardy gave a bill of sale to the brokerage company, executed and delivered it a warehouse receipt, entered into a written contract in which he agreed to deliver the potatoes, and at the suggestion of Mr. Hanson, who was conversant with local conditions, and who feared that there might be trouble in making a delivery, executed a bond in the sum of $7,000 with Cary's wife as surety, conditioned upon the performance of the contract and bill of sale. In February, 1914, in a suit instituted by the Potato Growers Association against the defendants, the nature of which the evidence does not disclose, a receiver was appointed. This receiver replevied the potatoes in the warehouse together with two carloads which Bernardy had loaded on the track destined for the brokerage company at St. Joseph. A little later a receiver in bankruptcy was appointed for the association

and the state receiver turned over to him the potatoes. Upon leave had from the Federal court the brokerage company sued the bankruptcy receiver and took possession of the potatoes. Bernardy furnished a bond in the sum of $8,000 for this purpose, his father and Cary's wife being sureties. The brokerage company then obtained from the warehouse 7,800 bushels of potatoes. This was in March. What became of the two carloads that had been before loaded, aggregating 1,150 bushels, does not appear. Before the trouble commenced two carloads were shipped by Bernardy to Lincoln, Nebraska. They were not accepted and were reshipped to the Price Brokerage Co., at St. Joseph, for sale on commission. It sold them. The proceeds of one car amounted to $301.02. The company sent this amount to Bernardy by check, but stopped its payment. The amount of the proceeds of the second car does not appear, but was apparently about the same as the other. The brokerage company retained the proceeds of both cars.

As a result of the transaction the brokerage company has received 7,800 bushels of potatoes without any deduction for shrinkage, instead of 8,250 bushels, and has received the proceeds of the sale of the two carloads first sent to Lincoln, amounting to 1,150 bushels. It has incurred some expense. Its title to the 7,800 bushels is in litigation. The contest over the title is with the receiver in bankruptcy of the Potato Growers Association; and the receiver necessarily depends upon the title of the association. There is no substantial evidence that the association had title to the potatoes. What the evidence in the replevin suit may show we do not anticipate.

There is much dispute as to the amount of potatoes in the warehouse at the time Price came to Barnesville in January. One Whitnack had 4,000 bushels in a separate bin. These were additional to the 13,000 bushels claimed. When the replevin suit was brought by the state receiver, the sheriff returned that he had taken 17,000 bushels. This was the state's evidence. The state showed that a number of farmers had deposited in the warehouse some 4,000 or 5,000 bushels during the fall or early winter of 1913. Bernardy had authority to sell a very considerable portion of these. It appears that there is a natural shrinkage of appreciable amount in stored potatoes. The

conditions in the warehouse were unfavorable and the shrinkage was great. Whitnack received practically nothing from his 4,000 bushels; and the testimony is that when Price was taking out his 7,800 bushels deterioration was rapid. There is much in the evidence to indicate that Bernardy, exclusive of the farmers' potatoes in storage, had as many as 8,250 bushels in January; and it is quite clear that of the farmers' potatoes he held several thousand bushels as bailee with authority of some kind to sell.

When the 7,800 bushels were shipped in March, Bernardy paid something like $800 for labor, something like $100 for sacks and for sorting, and paid the United States marshal $100. He also paid the expenses of the litigation had to get possession of the potatoes, or undertook to do so.

There is evidence that the brokerage company sought a criminal indictment to force the defendants to pay considerable sums of money.

We have sketched in some detail the salient features of the evidence. We think it cannot be found beyond a reasonable doubt that Cary fraudulently represented the ownership of the potatoes with intent to deceive and cheat the brokerage company. What more could have been done by Cary or Bernardy to make a delivery we do not see. Every effort was put forth. The only reason that a delivery was not made was because of the claim of the Potato Growers Association. The farmers who had stored their potatoes in the warehouse made no claim. It does not seem a reasonable deduction from the evidence that there was an intent to defraud the brokerage company. It may be that Cary and Bernardy were engaged in fraudulent practices. We are given only a limited view of what transpired. There is much to suggest that they were getting the better of the farmers. There is little to suggest that they were intending to get the better of Price.

Order reversed.