STATE v. K. K. PETERSON.[1]

April 30, 1926.

No. 25,269.

**Conviction for grand larceny sustained.**

Peterson was the treasurer of a creamery company. He deposited the money in a bank subject to check. He made and gave to the bank a debit slip for $2,500 and its president issued and delivered to Peterson five cashier's checks each for $500, charging the debit slip to the checking account the same as if it had been a paid check. Peterson used the cashier's checks in payment of his personal debt. He was indicted for appropriating money, which was in his hands as agent and employe, to his own use while he was authorized by agreement and competent authority to hold such money. *Held*:

(1) That the money of the company was involved and that the facts amounted to an embezzlement of the company's money within the meaning of G. S. 1923, § 10358, subd. 2.

(2) That there was no variance between the indictment and the proofs.

(3) That the indictment was sufficient.

(4) That the instructions to the jury were free from error.

(5)  (a) That the acts of two jurors, as stated in the opinion, did not constitute misconduct.

(b) That the record fails to support an assignment of error of misconduct of counsel in the course of argument.

(c) That a person may be a competent witness even though he is dissatisfied with our government, its administration of justice and does not believe in God.

Criminal Law, 16 C. J. p. 1081 n. 92 New; 17 C. J. p. 170 n. 12; p. 274 n. 17, 18.

Embezzlement, 20 C. J. p. 427 n. 23; p. 449 n. 77; p. 469 n. 37, 39; p. 478 n. 97.

Larceny, 36 C. J. p. 923 n. 72.

Witnesses, 40 Cyc. p. 2193 n. 90 New; p. 2202 n. 74; p. 2203 n. 77.

See notes in 42 L. R. A. 553; 23 L. R. A. (N. S.) 1023; 8 R. C. L. 822; 2 R. C. L. Supp. 659; 4 R. C. L. Supp. 574.

[1]Reported in 208 N. W. 761.

Defendant was convicted of grand larceny in the first degree before Flaherty, J., in the district court for Wilkin county. He appealed from the judgment, Affirmed.

*C. M. Hanson* and *Lewis E. Jones*, for appellant.

*Clifford L. Hilton*, Attorney General, *Victor E. Anderson*, Assistant Attorney General, and *Henry G. Wyvell*, County Attorney, for respondent.

WILSON, C. J.

Defendant having been convicted of grand larceny in the first degree appealed from a judgment entered after an order denying his motion for a new trial.

The facts are these: Defendant was the treasurer of the Farmers Co-operative Creamery Company of Rothsay, herein referred to as the company. He was also chairman of the board of directors of the First State Bank of Rothsay, with which the company carried its checking account. Defendant received a salary of $35 per month from the company and he alone, so far as the bank was concerned, had control of the company's money. As chairman of the board he had access to the internal affairs of the bank and at times participated in its routine business. On October 22, 1923, defendant, as administrator of the estate of Martin Anderson, made a settlement with Ole Anderson, the heir. The amount due the heir was $3,340. The company then had $2,696.13 on deposit. Defendant had on deposit in the bank $840, or perhaps more. He made out a debit slip against the account of the company for $2,500, signed and delivered it to the bank, which through its president issued and delivered to him five cashier's checks each in the sum of $500. He also received two other cashier's checks for $500 and $340, respectively, covering his deposit of $840. The bank charged the debit slip to the account of the company the same as a check for that amount. On the same day defendant indorsed and delivered all of the cashier's checks to Ole Anderson in settlement of the amount due from said estate. One of the $500 certificates was cashed by Anderson at a bank in Barnesville, another at a bank in

Fergus Falls and he indorsed and turned in to the First State Bank of Rothsay two of them, receiving therefor a certificate of deposit. On October 30, 1923, the First State Bank of Rothsay closed.

On May 19, 1924, defendant was indicted. The accusation was the embezzlement of lawful money of the United States of the value of $2,500 while being the agent and employe of the company. The charge rests upon the facts above stated.

1. Defendant now says that his conviction cannot stand because the money involved belonged to the bank and not to the company named in the indictment. In this transaction the bank was represented by its president who executed the cashier's checks. The record does not show that he or the bank had any notice or knowledge of defendant's wrongful designs. Perhaps, because the cashier's checks were made payable to defendant individually, and not as treasurer, the bank was charged with knowledge of defendant's lack of authority to do what he was in fact doing. Cahan v. Empire Trust Co. (C. C. A.) 9 F. (2d) 713. But that is of no importance in this case. Money had previously been withdrawn from this account by defendant by means of debit slips in place of checks. This was proper. Counsel invokes the rule as to the relationship between a depositor and a bank. We think the rule is without application. The important question is whether this transaction was any different than if defendant had possessed $2,500 in cash owned by the company and embezzled it.

A. Certainly the money of the company when deposited with the bank became the money of the bank. But when the debit slip was made and accepted by the bank there was, in law, a segregation of that much of the money of the bank from its general funds, which became the property of the company. The defendant as treasurer was entitled to it at his option in such form as he might elect consistent with ordinary banking business. Instead of taking the currency, a certificate of deposit or a draft, he chose cashier's checks. In this transaction the money of the depositor was involved. Certainly this was true even though it was but for a short time. Any time is sufficient.

B. Accepting another view we may consider, so far as defendant is concerned, the cashier's checks as the property of the company. Its money had paid for them. They were a means or vehicle, if not a device, used in withdrawing the actual money from the bank. Defendant had authority to withdraw the money. The misappropriation of which he was undoubtedly guilty consisted not in getting the cashier's checks but in what he did with them. They evidenced a demand of the company against the bank. The money or its equivalent which the bank parted with in redeeming them would, as far as defendant is concerned, be the money of the company. Defendant by his manipulation paid his obligation to Anderson. He therefore caused the bank to part with money belonging to the company. The commission of the offense charged is complete.

C. Defendant as treasurer deposited his principal's money in the bank. He withdrew $2,500 in five cashier's checks payable to himself. He used them to pay his personal debt. They were the equivalent of money. They passed as such. The cashier's checks and the bank itself were mere instrumentalities which defendant called to his assistance. The transaction for all practical purposes was no different than if he had kept and so used the money coming into his hands originally without ever depositing it in the bank. It was a simple transaction. He gained $2,500. His principal lost $2,500. The purpose and the result are obvious. He received the money. In what form is not important. It has disappeared by his wilful and intentional act. In ordinary parlance he took the company's money. The fact that he deposited it in the bank and withdrew it as indicated cannot destroy the fact that he was handling money. Defendant's claims are fanciful. Why quibble about whether what he got was the company's money? It was neither currency nor specie, but what of it? It served him as money. The loss was just as keen or severe as if it had been cash. The company is the only one that lost and it is the only one he intended should lose. This transaction has a very definite meaning and understanding in everyday life. All we need to do is to treat it naturally. Means of facilitating business do not change the real character of the trans-

action. In the administration of the criminal law we are more interested in the substance and effect of the transaction than in the technical rules of terminology. Defendant understood the charge in the indictment. He has not been misled. His substantial rights have not been invaded. We construe this transaction as an embezzlement of the company's money within the meaning of G. S. 1923, § 10358, subd. 2. This conclusion finds support in G. S. 1923, § 10662.

2. The contention that the proofs offered are at variance with the indictment cannot be sustained. Perhaps our construction of the transaction, as hereinbefore stated, makes it unnecessary to discuss this branch of the case. On the other hand the authorities which hold that there is not a fatal variance between an indictment for embezzling money and proof that the accused converted drafts or checks, support our conclusion. State v. Cary, 128 Minn. 481, 151 N. W. 186; People v. Dimick, 107 N. Y. 13, 14 N. E. 178; People v. Crane, 34 Cal. App. 599, 168 Pac. 377; Fulkerson v. State, 17 Okla. Cr. 103, 189 Pac. 1092; State v. Hoshor, 26 Wash. 643, 67 Pac. 386; Leach v. State, 46 Tex. Cr. 507, 81 S. W. 733; Powell v. State, 82 Tex. Cr. 163, 198 S. W. 317; Gurley v. State, 157 Ark. 413, 248 S. W. 902; Prinslow v. State, 140 Wis. 131, 121 N. W. 637; G. S. 1923, § 10662. As said by Mr. Justice Dibell in the Cary case: "To hold a fatal variance under these circumstances is but another application of a technicality, protecting no right of the accused, but tending to obstruct the administration of justice."

3. Defendant attacks the sufficiency of the indictment and cites State v. McCullough, 157 Minn. 69, 195 N. W. 764, in support of his claim that an indictment under G. S. 1923, § 10358, subd. 2, must allege a fiduciary relation between the accused and the owner of the property. In this case the indictment states that defendant was the agent and employe of the company. This is the necessary fiduciary relation. The indictment also alleges possession of $2,500 and says "being then and there authorized by agreement and competent authority to hold such money," etc. This is a sufficient allegation as to this element. It need not name the terms (State v. Marx, 139 Minn. 448, 166 N. W. 1082), nor the persons with whom

the agreement or arrangement was made nor the source of "compe-
tent authority." The form of this indictment is a very satisfactory
one and has been used in other cases. State v. Kortgaard, 62 Minn.
7, 64 N. W. 51; State v. Holmes, 65 Minn. 230, 68 N. W. 11. It is
sufficient.

4. We have carefully considered appellant's complaints as to the
instructions to the jury. We find them without merit. We regard
the charge as complete and properly covering the evidence and the
offense involved.

5. (a) During the trial of the case defendant's counsel charged
misconduct to two jurors and asked that they be discharged and
a mistrial declared. It was made to appear that two jurors had,
perhaps necessarily, occupied a bed in the same room where two of
the state's witnesses were sleeping. There was talk in which one
of the witnesses said: "They were easy on me today, but I suppose
I will get it tomorrow." A juror said: "I suppose you will hardly
get through tomorrow." A witness said to a juror: "I am sur-
prised they left you on the jury knowing Peterson (defendant) in
the way you do." To which he answered: "I did not like the idea
of sitting on the case." Affidavits disclose that this was all that
was said in reference to the case. We do not think this incident
constituted misconduct on the part of the two jurors. The incident
was casual. There was no intention of any improper conduct and
there was in fact nothing said touching the merits of the case or
relating to any of the facts or claims of either side.

(b) It is claimed that the assistant attorney general was guilty
of misconduct in his argument to the jury in transgressing G. S.
1923, § 9815. During his argument counsel for defendant inter-
rupted saying:

"I except to the statement 'undisputed, unchallenged and undenied'
as an allusion to the defendant not having taken the stand, and
the defendant not having done so."

The statement of defendant's counsel is the sole basis for this
assignment. He did not apply to the court to have the record show
the statement of counsel as actually made. This was his duty and

his right. The party asserting an error has the burden of establishing it. He must produce a record showing it. In such a case he must see to it that the record puts beyond controversy the language used. Upon this record we cannot say what the attorney said in his argument. In fact, we cannot say that he said anything. The record does not support the assignment and hence the merits of the assignment are not before us. It fails for want of the record. State v. Eggl (N. Dak.) 206 N. W. 784.

(c) The trial court excluded proof by defendant that a state's witness: Did not believe in our form of government; advocated its destruction and the substitution of a Soviet Republic; believed our courts did not properly administer justice and did not believe in God. No authority has been called to our attention in support of the claim that a person's belief in reference to his government and the courts disqualifies him from being a witness. The defendant contends that if the witness did not believe in God his oath was without meaning, i. e., that it would not bind his conscience to speak the truth. Lord Coke, 3 Inst. 165 (see note 42 L. R. A. 567) in substance said that none but a Christian man could take an oath. The common law required a belief in God. In Scotland it has been considered sufficient if the witness is willing to take the oath acknowledging it as an appeal to God.

Some states hold that a witness must believe in divine punishment in order to be a competent witness. Some distinguish between punishment in this world and the next. A few states intimate that an atheist is incompetent as a witness, but some say that he is. In most of the states, however, no religious opinion is required to render a witness competent. Article 1, § 17, of our Constitution reflecting a spirit of toleration says: "Nor shall any person be rendered incompetent to give evidence in any court of law or equity in consequence of his opinion upon the subject of religion." It was formerly provided by statute, G. S. 1894, § 5658: That persons shall not be excluded as witnesses "on account of their religious opinions or belief, although in every case the credibility of the witnesses may be drawn in question." This statute, however, was re-

pealed by §§ 5518 and 5521 of the Revised Laws of 1905. It would seem therefore that the belief of the witness in reference to God is no longer a subject which in this state affects his credibility and under the Constitution he is competent as a witness. Our statutes authorize a method of having the witness sworn in accordance with the peculiar ceremonies of his religion, if there are any, G. S. 1923, § 9818, and where a witness takes the usual oath without objection he must be recognized as a competent witness to give testimony in our courts. · This subject is thoroughly considered in a note in State v. Washington, 42 L. R. A. 553, 568. U. S. v. Kennedy, 3 McLean, 175.

Affirmed.