**UNITED STATES of America**

v.

**Ivan T. JOSEPH, Appellant.**

**No. 88–3140.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 3, 1989.

Decided Dec. 29, 1989.

Dennis M. Hart, Washington, D.C., appointed by this Court, for appellant.

Kirby D. Behre, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Asst. U.S. Atty., Washington, D.C., were on the brief, for appellee.

Before WILLIAMS and SENTELLE, Circuit Judges; and ROBINSON, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge SENTELLE.

Opinion concurring in part, and concurring in the judgment filed by Senior Circuit Judge ROBINSON.

SENTELLE, Circuit Judge:

Ivan T. Joseph ("Joseph" or "appellant") appeals his conviction for offenses related to the possession of firearms and drugs. He assigns as errors rulings on the lawfulness of a search, the disqualification of a juror, and the sufficiency of the evidence against him. Because we find that the District Court committed no reversible error, we affirm on all counts.

## I. BACKGROUND

Joseph and a companion arrived at Amtrak's Union Station in Washington, D.C. on February 23, 1988, on the "Night Owl" train from New York City. Two Metropolitan Police Department officers, Detective Curley and Sergeant Brennan, assigned to a drug interdiction unit at the station, observed the two walk toward a public telephone, where appellant placed a telephone call, apparently local in nature since he deposited only a single coin in the slot. In an increasingly familiar scenario, one of the officers, Detective Curley in this instance, approached the two and engaged them in conversation. Appellant's companion, later identified as Lawrence Mayers, also known as Shawn Joseph, stopped at the approach of the officer while appellant at first walked on, but soon returned. Curley told the two that he was with the police department and asked if he could speak with them a few minutes. Both agreed. Curley asked the two if they had come from New York, and if they had their tickets. Mayers stated that he did not have his, but appellant produced a ticket that showed he had just come from New York, a fact he had at first denied. Curley then asked for identification. Appellant produced a bank check cashing card, while Mayers replied that he had none, that he was only seventeen (as it turns out, a falsehood) and that he was traveling with his older brother, Joseph.

Curley noted that the only luggage apparently carried by the two was a tote bag then in the hands of the younger individual. He asked Mayers if he could search the bag and received permission. Then, believing Mayers to be a minor, also asked permission from the older brother. Joseph replied that this would be all right and that Curley could go ahead and search the bag. The younger man handed the bag to the officer, who placed it on the floor and unzipped it.

As Curley began to take items out of the bag, Joseph bent over and reached into it. Curley's partner, Sergeant Brennan, then said to Joseph, "If the officer has permis-

sion to search that bag, please allow him to do it, O.K.?''

Joseph replied, ''Do we have to do this here? ... I have underwear and things in the bag.'' The officer gestured to a more private area of the station—a customer service alcove—away from the flow of traffic. All four moved to that area and Curley continued to search the bag. The search yielded a loaded .38 caliber pistol and a quantity of crack cocaine, later measured at 70.55 grams. The officers immediately placed Joseph and Mayers under arrest.

On March 24, 1988, a grand jury returned a five-count indictment against the two. After one charge was dismissed, the appellant stood trial on charges of (1) possession with intent to distribute a controlled substance, namely cocaine, in violation of 21 U.S.C. §§ 841(a) and (b)(1)(A)(iii) and 18 U.S.C. § 2; (2) using or carrying a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1); (3) possession of a firearm without a valid registration certificate in violation of D.C.Code Ann. § 6–2311(a); and (4) possession of ammunition for a firearm without having a valid registration for the firearm in violation of D.C.Code Ann. § 6–2361. The District Court upheld the search at a separate suppression hearing; the evidence unfolded as summarized above; and the jury returned verdicts of guilty against appellant on all four counts.[1]

## II. ANALYSIS

### A. *The Search*

█ Joseph makes two claims that the police conduct at Union Station violated his Fourth Amendment rights. First, he argues that the manner of the police contact with him and his fellow traveler constituted an unlawful seizure without probable cause or reasonable suspicion. We note at the outset that the United States makes no claim that it had probable cause or even that it had a reasonable suspicion sufficient to justify a stop under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

Therefore, if a seizure occurred prior to the arrest, then Joseph is correct that it was an unlawful one. The difficulty for Joseph is that we find no error in the District Court's conclusion that no seizure occurred.

It is well established that not every contact between police officers and citizens raises Fourth Amendment implications. In the *Terry* decision itself, the Court noted:

> Obviously, not all personal intercourse between policemen and citizens involves "seizures" of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred.

392 U.S. at 19, n. 16, 88 S.Ct. at 1879, n. 16. As the Court later observed "police can be said to have seized an individual 'only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.)).

As we have previously made plain "in this circuit the test of whether a seizure has occurred is whether a reasonable person, innocent of any crime, would have felt free to walk away under the circumstances." *Gomez v. Turner*, 672 F.2d 134, 141 (D.C.Cir.1982). Supreme Court decisions plainly teach that any apprehension of lost freedom must reasonably arise from conduct of the police or from some show of authority. Consequently, it is clear that a seizure did not occur in the present case.

Nothing that appeared in the suppression hearing revealed that the officers had "by means of physical force or show of authority," or by any other means restrained the liberty of appellant or his companion. As we noted in *Gomez*, the police do not restrain liberty so as to constitute a seizure merely by approaching a citizen, directing toward him a question, or asking him for identification. *Id.* at 141–44. Here, the

---

**1.** Mayers was also convicted, but only on count one, the possession with intent to distribute charge. His conviction is not before us but is the subject of a separate appeal, No. 89–3046.

police did not tell Joseph that he could not leave, did not block his exit, and did not evidence any other signs of coercion. In short, the District Court did not err in concluding that no seizure had occurred.

■ Joseph, however, argues further that the search of the tote bag was an unreasonable one, violative of his Fourth Amendment rights. Again, we cannot agree. It is well established that police, even in the absence of probable cause, may conduct a warrantless search pursuant to voluntary consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973); *United States v. Brady*, 842 F.2d 1313, 1315 (D.C.Cir. 1988). The evidence before the District Court established without contradiction that appellant had given his consent in the present case. Nor can this consent be said to be involuntary. In this respect, the present case is similar to *Brady*, in which we noted that there was no coercion, but rather voluntary consent when plain clothes officers courteously requested and received permission before conducting a luggage search. 842 F.2d at 1314–15. While Joseph argues that his reaching into the bag during the search constituted a withdrawal of consent, a review of the relevant evidence supports the District Court's conclusion that the consent was voluntary, that Joseph acted under no coercion, and that Joseph did not withdraw consent. He apparently felt free to tell the officers that the contents of the bag could be embarrassing, and then accompanied them to a more private place for the completion of the search. If any coercion occurred at that point, Joseph has offered no evidence of it, and we cannot assume that which the evidence does not support. Certainly, as in *Brady*, we cannot conclude the trial judge's finding of consent "to be clearly erroneous." *Id.*

B. *The Jury Selection*

■ Appellant next argues that the District Judge committed reversible error in excusing for cause, on his own motion, a single juror. The exclusion followed what we must concede was a rather unusual colloquy between the trial judge and the juror. The relevant colloquy proceeded as follows:

THE COURT: Would your religious [sic] prejudice you from sitting in judgment on somebody?

MR. WALLS: If I have the evidence myself. If I am exactly sure I can go all the way. Circumstancial [sic] evidence I wouldn't. But if I am sure.

THE COURT: Well, the standard in the law is beyond a reasonable doubt. That doesn't mean beyond any doubt. That means it has to be a doubt based upon reason.

The standard that we use in criminal cases, there is a presumption of innocence. An individual who is charged with a crime is presumed to be innocent until you are convinced that the proof of the case is such that you can find him guilty beyond a reasonable doubt.

A reasonable doubt means a doubt based upon reason. A doubt that could make you hesitate in the ordinary course of your life in doing something. It is not a doubt based upon fancy or whim. It's a real doubt. Do you understand?

MR. WALLS: Yes.

THE COURT: Could you apply that standard?

MR. WALLS: Yes, I could.

THE COURT: And the fact that you are a man of the cloth and you, I assume, believe in the Almighty God?

MR. WALLS: Yes.

THE COURT: But you understand that in this Court I will give you certain instructions as to the law and that those must be followed in this Courtroom. The fact that you might have some beliefs that are different from those or that you believe that the Good Lord has ordered you to do something different from what I tell you, can you make sure that you are listening to me in this case?

MR. WALLS: No. I will listen to the Good Lord. I will listen to what he wants. I am under his supervision.

THE COURT: I know. But the Good Lord will not be giving the instructions in this case.

MR. WALLS: He will give me a mind to think. I'm pretty close to him. I'm not trying to be contemptious [sic] but I want to make sure I make the right decision.

THE COURT: Well, what you are saying is that if there is a conflict between what the Lord has told you and what I'm telling you, the Lord prevails.

MR. WALLS: That's right.

THE COURT: All right. I'm going to ask you to go back to the jury room.

Transcript, June 20, 1988, 74–75. Appellant argues persuasively that the question put to the juror, by requiring a choice between obedience to God and obedience to the law, did not accurately test his fitness to serve as a juror, as certainly many or most religious persons actually put to that test would respond in the same fashion as the juror in this case. As appellant reasons, the law, functioning in the real world, simply cannot be expected to put a juror or anyone else to that test. However, this does not compel the reversal that appellant seeks.

Appellant reasons that he is entitled to a new trial based on a line of cases typified by *Smith v. Texas*, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84 (1940), and *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), supporting the fundamental principle "that '[i]t is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community.'" *Taylor*, 419 U.S. at 527, 95 S.Ct. at 696 (quoting *Smith*, 311 U.S. at 130, 61 S.Ct. at 165). Otherwise put, the jury must consist "'of a cross-section of the community.'" *Id.* at 528, 95 S.Ct. at 697 (quoting the plurality opinion in *Apodaca v. Oregon*, 406 U.S. 404, 410, 92 S.Ct. 1628, 1633, 32 L.Ed.2d 184 (1972)).

It is, however, not at war with the fundamental principle defended by this line of cases to note that the line concerns exclusion of classes of potential jurors, not individuals. As the Supreme Court noted in *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979):

In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

In the present case, appellant has met none of these requirements. From the record before us, we have no definition of the class, other than appellant's vague references to the limitation of "the prospective panel to only those people who were without Mr. Walls' religious background and beliefs." Brief of Appellant at 26. This falls far short of defining the class in a "distinctive" fashion. We certainly do not intend to teach that exclusion of a religious class is permissible. *See State v. Madison*, 240 Md. 265, 213 A.2d 880 (1965) (dismissing indictment where grand jury unconstitutionally required to affirm belief in God); *Schowgurow v. State*, 240 Md. 121, 213 A.2d 475 (1965) (overturning conviction by jury assembled under Maryland requirement of belief in God). But the present record provides nothing comparable to the unconstitutional exclusion from jury service of defined classes in *Smith* (race), *Taylor* (gender), and *Thiel v. Southern Pacific Co.*, 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946) (economic class—specifically blanket exclusion of all who work for daily wages).

The most that the present record discloses is the possibly improper exclusion of a single juror. This question is governed by the reasoning expressed by our sister circuit in *United States v. Calhoun*, 542 F.2d 1094 (9th Cir.1976), *cert. denied sub nom.*, *Stephenson v. United States*, 429 U.S. 1064, 97 S.Ct. 792, 50 L.Ed.2d 781 (1977). In that case, an appellant argued that the trial judge on his own motion had improperly excused two jurors for cause. As the Ninth Circuit noted there, "a trial judge has broad discretion" in jury selec-

tion, "which will not be reversed absent clear abuse." *Id.* at 1103.

As the Supreme Court has determined, the question of impartiality of an individual juror "is essentially one of credibility, and therefore largely one of demeanor." *Patton v. Yount*, 467 U.S. 1025, 1038, 104 S.Ct. 2885, 2892, 81 L.Ed.2d 847 (1984). Though *Patton* involved a habeas petition, the Supreme Court observed that "the trial court's resolution of such questions is entitled, even on direct appeal, to 'special deference.'" *Id.* While in the present case the question and answer on a cold transcript might appear to disqualify such a large portion of the community as to render a cross-section panel impossible, or to impose an unconstitutional religious test on service as a venireman,[2] it takes but little imagination to demonstrate that there are many different ways of saying that one would "obey God rather than man." It may be that the juror's answer led the trial court, rightly or wrongly, to conclude that the juror found it likely that God and the judge would offer him inconsistent instructions, and that he must accede to the Higher Authority. Thus while we certainly do not recommend that district judges make a practice of putting the question posed in this case, we cannot conclude, given the deference we owe, that the District Court necessarily erred in the exclusion of this single juror.

Again, as the Ninth Circuit observed in *Calhoun*, "moreover, regardless of the propriety of excusing [a single venireman] we would not be inclined to reverse." 542 F.2d at 1103. As the Second Circuit observed in *United States v. Puff*, 211 F.2d 171, 184–85 (1954), "a party is entitled to an array of impartial jurors to which he may direct his peremptory challenges. To this a party is entitled as of right. But granted this, the party is entitled to no more." While the *Puff* decision is of doubtful continuing vitality, as it involved questions of death penalty scruples, since settled in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and its progeny, its reasoning remains valid for the general proposition that exclusion of a single juror does not ordinarily provide a basis for disturbing a guilty verdict. A defendant has no constitutional or other right to the service of a particular juror. Granted, "if a judge without justification overrules a challenge for cause and thus leaves on the panel a juror not impartial" we would expect reversible error to have occurred. *Puff*, 211 F.2d at 185. Obviously, such an improper inclusion of jurors can violate the defendant's right to an impartial jury. However, the exclusion of a single juror, even if improper, does not suggest any lack of impartiality on the part of those jurors in fact serving. Appellant has offered nothing else to demonstrate even a hint of partiality on the part of the panel actually selected. This argument affords him no relief.

### C. *The Sufficiency of the Evidence*

Appellant finally argues that the evidence was insufficient to support the guilty verdicts rendered against him. His basic contention is that because the bag containing the cocaine and loaded weapon was in the hands of his companion rather than his own, the jury could not have found the

---

**2.** The common law presumed that those who did not profess a belief in God were unqualified to serve as jurors or witnesses. *Torasco v. Watkins*, 223 Md. 49, 162 A.2d 438 (1960) ("[N]or shall any person, otherwise competent, be deemed incompetent as a witness, or juror, on account of his religious belief; provided, he believes in the existence of God, and that under His dispensation such person will be held morally accountable for his acts, and be rewarded or punished therefor either in this world or in the world to come.") (quoting Article 36 of the Maryland Declaration of Rights), *rev'd*, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961); III Coke, Lord Coke's First Institute 483, 488 (J.H. Thomas ed. 1818). *See State v. Peterson*, 167 Minn. 216, 208 N.W. 761, 764 (1926) ("The common law required [that witnesses] belie[ve] in God."); *Brink v. Stratton*, 176 N.Y. 150, 68 N.E. 148 (1903) ("At the common law no one but a Christian was a competent witness.") (Cullen, J., concurring). This criterion has been abandoned. *See, e.g., State v. Jackson*, 156 Iowa 588, 137 N.W. 1034, 1036 (1912); *cf.* Fed.R.Evid. 610; *Reason v. Bridges*, 20 F.Cas. 370 (C.C.D.C.1807) (No. 11,617). Nevertheless, the abandonment of that qualification did not either establish or permit a requirement that jurors not believe in God.

element of possession necessary to convict him on counts one, three, and four and the element of using or carrying a firearm essential to count two. We find appellant's argument inadequate as to all counts.

■ Laying aside for the moment the question of "using or carrying" a firearm raised by count two, we will focus first on the possession element common to counts one, three, and four. Appellant's argument that he cannot be convicted because the drugs and firearm were in the possession of his companion and not himself ignores the fundamental law that possession can be constructive as well as actual, joint as well as sole, and proved by circumstantial as well as direct evidence. *See generally United States v. Durant*, 648 F.2d 747, 751 (D.C.Cir.1981); *United States v. Raper*, 676 F.2d 841, 847 (D.C.Cir.1982); *United States v. Lawson*, 682 F.2d 1012, 1017 (D.C.Cir.1982). As we noted in *Durant:*

> "It ... is unnecessary to show that the accused had the drug on his person or within his immediate reach, it is enough that he 'was knowingly in a position or had the right to exercise dominion and control over' it, either directly, or through others. Possession in that sense suffices though it is jointly shared, and it may be established by circumstantial as well as direct evidence."

648 F.2d at 747 (quoting *United States v. Staten*, 581 F.2d 878, 883 (D.C.Cir.1978)).

Applying these established principles of law, and "allowing the government the benefit of all reasonable inferences that may be drawn from the evidence," as we must in reviewing a motion for a judgment of acquittal, *United States v. Musser*, 873 F.2d 1513, 1519 (D.C.Cir.1989), we simply cannot conclude that "there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt" so as to reject the jury's verdict of guilty. *United States v. Davis*, 562 F.2d 681, 683 (D.C.Cir.1977).

Viewing the evidence in the present case, the reasonable jury—upon learning that appellant acted in concert with the person carrying the bag in every stage of the contact with the law enforcement officers; that he purported sufficient control over the bag and its contents first to consent to its search and then to request that the bag be moved to another location before the completion of the search; and, that the bag contained his personal items—might reasonably conclude not only that he "was knowingly in a position, or had the right to exercise 'dominion or control' " over the bag and its incriminating contents, *Lawson*, 682 F.2d at 1017, but that he was in fact exercising such dominion and control. Coupling this evidence with the evidence that after the police found the drugs in the bag, appellant suddenly claimed that he and Mayers had found the bag on an escalator, we certainly cannot say that the guilty verdict was not a rational one based on the evidence in the case.[3]

■ Count two presents a slightly different question. 18 U.S.C. § 924(c)(1) outlaws not possession but "us[ing] or carr[ying]" a firearm during and in relation to a drug trafficking crime. While the statute speaks in the disjunctive, "whoever ... uses *or* carries a firearm," the indictment spoke in the conjunctive, "Ivan T. Joseph ... used *and* carried a firearm." On an indictment charged in the conjunctive, when there is evidence sufficient to support conviction on one of the acts charged, the conviction will not be disturbed for lack of sufficiency of the evidence. *Turner v. United States*, 396 U.S. 398, 420–21, 90 S.Ct. 642, 654, 24 L.Ed.2d 610 (1970) ("when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive ... the verdict stands if the evidence is sufficient with respect to any one of the acts charged"). Without deciding whether or not the evidence in the present case is sufficient on the statutory element of "using," the evidence fits well within the statutory meaning of "carrying" as defined in our recent decision in *United*

---

3. We note as to all firearms-related counts that the jury found appellant guilty and Mayers not guilty, apparently concluding that the physical possession by the younger brother represented no more than his performing the duty of a conduit for appellant.

*States v. Evans*, 888 F.2d 891 (D.C.Cir. 1989).

■ While we noted in *Evans* that "'carrying' for section 924(c)(1) purposes may not be synonymous with 'having constructive possession,'" neither does it require actual physical wearing or bearing a gun on one's person. 888 F.2d at 895. When a person "has a present ability to exercise dominion and control over" a firearm and further has the firearm "within easy reach and available to protect him during his ongoing [drug trafficking] offense," *id.*, he has rather plainly committed the act Congress intended to preclude by the passage of the statute. While it may be that there are cases in which a defendant's constructive possession of a firearm is sufficiently removed from his ready access that the facts would not support a conclusion that he was carrying the firearm at the time in question, the present facts do not present such a case. Here, the defendant was at all relevant times within a few steps of, and usually no more than an arm's span from, the firearm. Of course, the carrying must be done knowingly. *Id.* But, here, the evidence supporting the jury's verdict of guilty on the possession charges goes likewise to support circumstantially the conclusion that the defendant knew that the firearm was in the bag, and intended to carry it for the protection of his drug trafficking activity.

We cannot say that the evidence in this case is the strongest conceivable, or even the strongest we have seen. But that is not the test. As we noted above, it is only necessary that there be "evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt." *Davis*, 562 F.2d at 683. In this case there is.

### III. CONCLUSION

To recapitulate, we conclude that: (1) the police conduct at Amtrak's Union Station did not violate Joseph's Fourth Amendment rights since there was no seizure and the search was conducted by consent; (2) the District Court committed no reversible error in excluding a single juror; and (3) the evidence was sufficient to support the guilty verdicts on all counts. Therefore, the judgment of the District Court is affirmed.

ROBINSON, Senior Circuit Judge, concurring in part, and concurring in the judgment:

I join my colleagues in sustaining the District Court's denial of Joseph's motion to suppress the drugs and the handgun found in the tote bag. My analysis and as well my earlier concerns on that score, however, go beyond the discussion in Part II(A) of the majority opinion. I also agree, but for reasons incongruent with those expressed in Part II(B) of that opinion, that the District Court did not err in dismissing the Reverend Mr. Walls from the panel of prospective jurors. Consequently, I write separately to explain my position on these two matters. I concur unreservedly in Part II(C) of the majority opinion, confirming the sufficiency of the evidence to support Joseph's convictions.

### I

It is settled that "a search conducted pursuant to a valid consent is constitutionally permissible."[1] It is equally well established, however, that "[w]hen a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given."[2] When the

---

1. *Schneckloth v. Bustamonte*, 412 U.S. 218, 223, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854, 860 (1973). See also *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1323–1324, 75 L.Ed.2d 229, 236 (1982); *United States v. Mendenhall*, 446 U.S. 544, 558–559, 100 S.Ct. 1870, 1879–1880, 64 L.Ed.2d 497, 512–513 (1980); *Davis v. United States*, 328 U.S. 582, 593–594, 66 S.Ct. 1256, 1261–1262, 90 L.Ed. 1453, 1460–1461 (1946);

*Zap v. United States*, 328 U.S. 624, 630, 66 S.Ct. 1277, 1280, 90 L.Ed. 1477, 1483 (1946).

2. *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797, 802 (1968). See also *Schneckloth v. Bustamonte, supra* note 1, 412 U.S. at 222, 93 S.Ct. at 2045, 36 L.Ed.2d at 860; *Florida v. Royer, supra* note 1, 460 U.S. at 497, 103 S.Ct. at 1324, 75 L.Ed.2d at 236; *United*

police officers asked Joseph to countenance a search of the bag, his initial response was clearly of that caliber.[3] But the officers' testimony did not foreclose the possibility that Joseph manifested a change of mind, and a revocation of his prior consent, when he thrust his hand into the bag as Officer Curley began to remove its contents.

That single act, without further elucidation, was pregnant with ambiguity. Was Joseph seeking merely to protect his underwear from public exposure, or was he trying to halt any further examination of the bag? If the latter, was the officers' responsive action coercive, and thus destructive of the voluntariness of the consent originally expressed?[4] Officer Brennan testified that when Joseph intruded, "I stopped him from doing that,"[5] but he did not explain how he stopped him.[6] What was Brennan's tone of voice when he said to Joseph, "[i]f you've given the officer permission to search the bag, why don't you let him search it"?[7] What gestures, if any, accompanied the words spoken? Answers to these and similar questions might have shed light upon this equivocal episode.

Nonetheless, no adequate basis for upsetting the District Court's ruling on the motion to suppress is apparent. Since neither Joseph nor his companion testified or offered any other evidence, the factual version presented by the Government stood wholly uncontradicted, and paved the way to the District Court's conclusion. The court observed the demeanor of the Government's witnesses as they detailed the hand-reaching incident; it heard them testify that after the bag was moved from the heavily-traveled main concourse of Union Station to the comparative seclusion of the customer service area, the search continued without further interference by Joseph.[8] The court announced that it credited the officers' testimony,[9] and expressly found that Joseph did not withdraw his consent to the search.[10] We must accept that finding unless it was clearly erroneous,[11] and plainly it was not.

## II

On voir dire examination, the District Court directed to the panel of prospective jurors a series of inquiries on a variety of subjects, including whether any had assisted in a program of drug rehabilitation.[12] Several, including Mr. Walls, answered in the affirmative, after which they were brought to the bench individually for additional questioning. When Mr. Walls was reached, he confirmed the court's understanding that he was pastor of a local church,[13] and acknowledged that he "work[ed] with concerned citizens helping folks who are on drugs that want to get

States v. Mendenhall, supra note 1, 446 U.S. at 557, 100 S.Ct. at 1879, 64 L.Ed.2d at 511.

3. Compare Schneckloth v. Bustamonte, supra note 1, 412 U.S. at 220, 93 S.Ct. at 2044, 36 L.Ed.2d at 858–859; Florida v. Royer, supra note 1, 460 U.S. at 494–495, 103 S.Ct. at 1322–1323, 75 L.Ed.2d at 234; United States v. Mendenhall, supra note 1, 446 U.S. at 548, 100 S.Ct. at 1874, 64 L.Ed.2d at 505.

4. Compare Schneckloth v. Bustamonte, supra note 1, 412 U.S. at 228–229, 93 S.Ct. at 2048–2049, 36 L.Ed.2d at 863–864.

5. Transcript of Hearing on Motion to Suppress (Tr. I) 70.

6. Since the officer stated that he feared that Joseph was reaching for a weapon in the bag, Tr. I 70–71, a feeble or gentle reaction presumably was not a priority.

7. Tr. I 71.

8. Tr. I 13–14, 72.

9. Tr. I 98.

10. Id.

11. Campbell v. United States, 373 U.S. 487, 493, 83 S.Ct. 1356, 1360, 10 L.Ed.2d 501, 507 (1963); Jackson v. United States, 122 U.S.App.D.C. 324, 326–327, 353 F.2d 862, 864–865 (1965). See also Maine v. Taylor, 477 U.S. 131, 145, 106 S.Ct. 2440, 2451, 91 L.Ed.2d 110, 125 (1986); United States v. Thomas, 275 U.S.App.D.C. 21, 24, 864 F.2d 843, 846 (1989). Undeniably, voluntariness of consent to search is a question of fact. Schneckloth v. Bustamonte, supra note 1, 412 U.S. at 248–249, 93 S.Ct. at 2058–2059, 36 L.Ed.2d at 875.

12. Transcript of Trial Proceedings (Tr. II) 16.

13. Tr. II 73.

off." [14] When the court asked whether "that would prevent you from being a fair and impartial juror in this case," [15] the response was "Well, I want to do what's right. I have a conscious [sic]." [16] When the court inquired as to whether "you can make determinations about people," [17] the answer was "Yes, I can." [18]

The questioning then shifted to a related subject. The court asked whether his "religious [sic] prejudiced him from sitting in judgment on somebody." [19] Mr. Walls stated:

> If I have the evidence myself. If I am exactly sure I can go all the way. Circumstantial evidence I wouldn't. But if I am sure. [20]

The court then told him that the correct standard was "beyond a reasonable doubt," [21] and explained the meaning of the term. [22] Mr. Walls said that he understood [23] and could apply that standard, [24] but immediately thereafter a problem arose. The court informed him that it would "give you certain instructions as to the law and that those must be followed in this Courtroom," [25] and thereupon posed this question:

The fact that you might have some beliefs that are different from those or that you believe that the Good Lord has ordered you to do something different from what I tell you, can you make sure that you are listening to me in this case. [26]

Mr. Walls' reply thereto was "No. I will listen to the Good Lord. I will listen to what he wants. I am under his supervision;" [27] a bit later he added that "He will give me a mind to think. I'm pretty close to him [sic]. I am not trying to be contemptious [sic] but I want to make sure I make the right decision." [28] The court then made its final inquiry:

> Well, what you are saying is that if there is a conflict between what the Lord has told you and what I'm telling you, the Lord prevails. [29]

Mr. Walls said "That's right," [30] and at this point he was dismissed. [31]

Joseph claims that the dismissal deprived him of "a fair jury panel that is drawn from a cross section of the community." [32] He declares that the District Court's action "raises the specter of the exclusion of jurors by class." [33] The Government insists that Joseph falls short in his endeavor to

14. Tr. II 73.

15. Tr. II 73.

16. Tr. II 73–74.

17. Tr. II 74.

18. Tr. II 74.

19. Tr. II 74.

20. Tr. II 74.

21. Tr. II 74.

22. Tr. II 74.

23. Tr. II 74.

24. Tr. II 74.

25. Tr. II 75.

26. Tr. II 75.

27. Tr. II 75.

28. Tr. II 75.

29. Tr. II 75.

30. Tr. II 75.

31. Tr. II 75.

32. Brief for Appellant at 26. See, e.g., *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579, 586–587 (1979); *Taylor v. Louisiana,* 419 U.S. 522, 530, 95 S.Ct. 692, 697–698, 42 L.Ed.2d 690, 698 (1975); *Smith v. Texas,* 311 U.S. 128, 130, 61 S.Ct. 164, 165, 85 L.Ed. 84, 86 (1940).

33. Brief for Appellant at 27. See, e.g., *Duren v. Missouri, supra* note 32, 439 U.S. at 364, 99 S.Ct. at 668, 58 L.Ed.2d at 586–587; *Avery v. Georgia,* 345 U.S. 559, 561–562, 73 S.Ct. 891, 892–893, 97 L.Ed 1244, 1247–1248 (1953); *Ballard v. United States,* 329 U.S. 187, 193, 67 S.Ct. 261, 264, 91 L.Ed. 181, 185–186 (1946). The theory underlying Joseph's arguments seems to be that countless individuals asked the questions put to Mr. Walls would give the same answers, with the result that everybody with strong religious commitments would be excluded from petit juror service. See Majority Opinion 122.

demonstrate such a transgression.[34] After considerable discussion, my colleagues agree, and dispose of Joseph's contentions on that basis.[35]

Unlike the parties and the majority, I see no need to travel that tortuous route. The record establishes beyond peradventure that Mr. Walls would disobey the District Court's instructions whenever he felt that they collided with his religious tenets. The record is equally emphatic in its showing that he was dismissed for that reason alone.[36]

The case at bar seems indistinguishable from *Lockett v. Ohio,*[37] in which potential jurors were excused after they said that by reason of their opposition to capital punishment, they could not "take an oath to well and truely [sic] try this case . . . and follow the law."[38] The Supreme Court upheld their dismissal because it was " 'unmistakably clear' that they could not be trusted to 'abide by existing law' and 'to follow conscientiously the instructions' of the trial judge."[39] With particular reference to a fair-cross-section contention there presented, the Court rejected the notion "that the right to a representative jury includes the right to be tried by jurors who have explicitly indicated an inability to follow the law and instructions of the trial judge."[40] *Lockett* thus demolishes at the outset the thesis advanced by Joseph and meticulously analyzed and dismantled by the majority, and furnishes the short but complete answer to all that Joseph argues.[41]

Thus stripped of its constitutional overtones, Joseph's protest amounts to no more than a claim that the District Court erred as a matter of ordinary law, and as such it is doomed to failure. A district court has wide latitude in conducting voir dire proceedings, including the form, nature and range of questions put to potential jurors,[42] and its action in this regard "is entitled, even on direct appeal, to 'special deference.' "[43] If the court's exclusion of a pro-

**34.** Brief for Appellee at 17–20. The Supreme Court teaches us that

> [i]n order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which jurors are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri, supra* note 32, 439 U.S. at 364, 99 S.Ct. at 668, 58 L.Ed.2d at 586–587.

**35.** Maj.Op. 122–125.

**36.** Additionally to what has been said, Joseph's counsel objected to dismissal of Mr. Walls, contending that "the question you are asking [Mr. Walls] is sort of like something that you would ask him to do that would be so unconscionable." Tr. II 76. The judge overruled the objection explaining that "[t]here are times when the Court has to give directions and instructions. I could not tolerate somebody suggesting to me that my instructions would not be carried out." Tr. II 76.

**37.** 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

**38.** *Id.* at 595–596, 98 S.Ct. at 2959–2960, 57 L.Ed.2d at 983–985.

**39.** *Id.* at 596, 98 S.Ct. at 2960, 57 L.Ed.2d at 984 (quoting *Boulden v. Holman,* 394 U.S. 478, 484, 89 S.Ct. 1138, 1142, 22 L.Ed.2d 433, 439 (1969)).

**40.** *Id.* 438 U.S. at 596–597, 98 S.Ct. at 2960–2961, 57 L.Ed.2d at 984–985.

**41.** To be sure, *Lockett* involved exclusion of prospective jurors for their unalterable stance against the death penalty. The Supreme Court, however, has recognized that the same analysis applies to juror-exclusion cases of all types, *Wainwright v. Witt,* 469 U.S. 412, 423, 105 S.Ct. 844, 852, 83 L.Ed.2d 841, 851 (1985), because "the quest is for jurors who will conscientiously apply the law and find the facts. That is what an impartial jury consists of." *Id.*

**42.** *Ham v. South Carolina,* 409 U.S. 524, 527, 93 S.Ct. 848, 850–851, 35 L.Ed.2d 46, 50 (1973); *Connors v. United States,* 158 U.S. 408, 413, 15 S.Ct. 951, 953, 39 L.Ed. 1033, 1035 (1895); *United States v. Brooks,* 185 U.S.App.D.C. 267, 271, 567 F.2d 134, 138 (1977); *United States v. Caldwell,* 178 U.S.App.D.C. 20, 32, 543 F.2d 1333, 1345 (1974).

**43.** *Patton v. Yount,* 467 U.S. 1025, 1038, 104 S.Ct. 2885, 2892, 81 L.Ed.2d 847, 858 (1984). See also *Wainwright v. Witt, supra* note 41, 469 U.S. at 425–426, 105 S.Ct. at 852–853, 83 L.Ed.2d at 852–853; *Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 500, 104 S.Ct. 1949, 1959, 80 L.Ed.2d 502, 516 (1984). And see *Irvin v. Dowd,* 366 U.S. 717, 723, 81 S.Ct. 1639, 1643, 6

spective juror is "fairly supported by the record," it will not be upset.[44] That is because trial courts are in a unique position to assess the demeanor and credibility of those under consideration for petit jury service, and thus to safeguard the accused's Sixth Amendment right to an impartial jury.[45] The court's discretion in this area, of course, is not unbounded. The court may err either in failing to investigate the existence and strength of potential bias,[46] or, on the other hand, by disqualifying a potential juror holding "some impression or opinion as to the merits of the case" but able to "lay aside his impression or opinion and render a verdict based on the evidence presented in court."[47] However, trial courts have the difficult task of separating those who will impartially find the facts and conscientiously apply the law from those who will not. In close cases, where the record does not clearly indicate that a particular juror falls within one category or the other, we must yield considerable deference to the trial judge's "definite impression that a prospective juror would be unable to faithfully and impartially apply the law."[48]

The situation before us, however, is not nearly so close as to require reliance on the District Court's evaluation. Mr. Walls left no doubt that he would choose religion over the court's instructions should there appear

to him to be a conflict between the two. The District Court was plainly right in dismissing him as a prospective juror.

---

L.Ed.2d 751, 756 (1961) (error must be manifest).

**44.** *Darden v. Wainwright,* 477 U.S. 168, 176, 106 S.Ct. 2464, 2469, 91 L.Ed.2d 144, 154 (1986).

**45.** "The trial judge's function at this point in the trial is not unlike that of the jurors later on in the trial. Both must reach conclusions as to impartiality and credibility by relying on their own evaluation of demeanor evidence and responses to questions." *Rosales–Lopez v. United States,* 451 U.S. 182, 188, 101 S.Ct. 1629, 1634, 68 L.Ed.2d 22, 28 (1981).

**46.** *Turner v. Murray,* 476 U.S. 28, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1985) (in a capital case where the victim is white and the accused is black); *Ristaino v. Ross,* 424 U.S. 589, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976) (trial where race is inextricably bound up with issues for the jury); *Ham v. South Carolina, supra* note 42, 409 U.S. at 527, 93 S.Ct. at 850–851, 35 L.Ed.2d at 50 (possible racial prejudice may distort consideration of

factual questions); *Brown v. United States,* 119 U.S.App.D.C. 203, 204–205, 338 F.2d 543, 544–545 (1964) ("when important testimony is anticipated from certain categories of witnesses, whose official or semi-official status is such that a juror might reasonably be more, or less, inclined to credit their testimony, a query as to whether a juror would have such an inclination ... should be given if requested").

**47.** *Irvin v. Dowd, supra* note 43, 366 U.S. at 722–723, 81 S.Ct. at 1642–1643, 6 L.Ed.2d at 755–756 (impression created by pretrial publicity). And see *Darden v. Wainwright, supra* note 44, 477 U.S. at 178, 106 S.Ct. at 2470, 91 L.Ed.2d at 155 (opinion against capital punishment); *Reynolds v. United States,* 98 U.S. 145, 156, 25 L.Ed. 244, 246 (1878) (court must assess whether "nature and strength of opinion formed are such as in law necessarily to raise the presumption of partiality").

**48.** *Wainwright v. Witt, supra* note 41, 469 U.S. at 425–426, 105 S.Ct. at 852–853, 83 L.Ed.2d at 852–853.